226 N.J. Super. 200 (1988)
543 A.2d 1020
PERTH AMBOY IRON WORKS, INC., A NEW JERSEY CORPORATION, AND BOCRA CHARTERS, INC., A DELAWARE CORP., PLAINTIFFS-APPELLANTS,
v.
AMERICAN HOME ASSURANCE COMPANY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1988.
Decided June 30, 1988.
*203 Before Judges DREIER, BAIME and ASHBEY.
Joseph DiRienzo argued the cause for appellants (Joseph DiRienzo, on the brief).
Rudy B. Coleman argued the cause for respondent General Motors Corporation (Carpenter, Bennett & Morrissey, attorneys; Rudy B. Coleman, of counsel; Rudy B. Coleman and Stephen F. Payerle, on the brief).
*204 Jerome M. Lynes argued the cause for respondent Ocean Yachts, Inc. (Connell, Foley & Geiser, attorneys; Jerome M. Lynes, of counsel; Frank A. Lattal, on the brief).
Frederick J. Wortmann argued the cause for respondent Johnson & Towers, Inc. (Braff, Ertag, Wortmann, Harris & Sukoneck, attorneys; Frederick J. Wortmann, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs have appealed from a judgment in their favor in the amount of $181,000, alleging that their claims were unduly restricted by various limiting pretrial and trial rulings by the trial judge. Plaintiffs are family businesses, Perth Amboy Iron Works, Inc. and Bocra Charters, Inc., (referred to collectively as plaintiff) which originally filed this action in the United States District Court for the District of New Jersey, where it was dismissed for lack of subject matter jurisdiction on October 7, 1983. The action was then filed in the Superior Court of New Jersey, Middlesex County. Plaintiff's complaint alleged negligence, breach of warranty, strict liability, fraud and misrepresentation, reckless conduct, and various violations of federal and state unfair trade practice laws against 45 corporate and individual defendants. Pretrial motions and stipulations resulted in the dismissal of all defendants from the action except for three corporate defendants: Ocean Yachts, Inc., Johnson & Towers, Inc. and General Motors Corp. The trial judge also dismissed plaintiff's claims under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., the Unfair Competition Act, N.J.S.A. 56:4-1 et seq. and the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. During trial the judge further dismissed plaintiff's claims of fraud, and those for lost profits and punitive damages.
The six Bocra brothers, the sole shareholders in Perth Amboy Iron Works, formed Bocra Charters, Inc. after attending a Fort *205 Lauderdale boat show in November 1980 where they ordered a sport fishing boat manufactured by defendant Ocean Yachts.[1] Bocra Charters took title to the yacht in January 1981, and Perth Amboy Iron Works began leasing the yacht from Bocra Charters for a monthly fee. The yacht's engines were manufactured by Detroit Deisel Allison (DDA), a division of defendant General Motors (GM) (the manufacturer will be referred to as GM), and supplied to Ocean Yachts (OY) by defendant Johnson & Towers (J & T), an authorized GM distributor, who modified the engines for higher performance. Plaintiff paid $331,000 for the boat plus an additional $20,000 for fuel injection modifications which generated higher horsepower.
J & T allegedly had increased the horsepower beyond factory ratings, and GM had advised its dealers that such increases were unauthorized. The engines, however, were advertised as GM approved, and plaintiff contends that it was misled to believe that the engines were fully warranted by GM. This assertion of being misled, however, has little force, since GM in fact has honored its warranty through successive repairs and even replaced one of the engines with a similar one, also containing the same J & T fuel injector modification.[2]
On its maiden voyage, the yacht experienced mechanical and electrical problems which were repaired under warranty by Ocean Yachts. The next six months were marked by a series of engine fires and a subsequent flurry of inspections, repairs and replacements which are discussed in greater detail infra. Plaintiff asserts that in October 1981 the yacht was docked to make some fairly minor repairs which revealed, little by little, *206 that the boat's structure and electrical system had both been damaged by fire and/or were inherently unsound,[3] and which required 18 months to repair. Plaintiff expended $261,000 to repair the fire-related damage and structural unsoundness, not including the cost to replace the engines with two new engines by a different manufacturer.[4] Defendants allege that plaintiff exploited an unfortunate situation and took this opportunity to refurbish and upgrade the yacht. After being instructed on the sole remaining theory of breach of warranty, the jury awarded $181,000 in damages to plaintiff.
Plaintiff raises the following seven points on this appeal:
POINT I:
The trial court's dismissal of plaintiffs' claim for violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. was procedurally and substantively incorrect.
POINT II:
The trial court's sua sponte dismissal of plaintiffs' claim of legal fraud against all defendants is manifestly unjust and contrary to the law.
POINT III:
The trial court wrongfully limited plaintiffs' damages and eliminated evidence by the courts own definition.
POINT IV:
Plaintiffs are entitled to pursue a remedy under the Magnuson-Moss Warranty Act.
POINT V:
The court improperly dismissed all claims for negligence, strict liability, punitive damages and fraud.
POINT VI:

*207 The trial court erred in denying plaintiffs' motion for a new trial.
POINT VII;
The court below abused its judicial discretion and denied plaintiffs a fair trial by its misconduct.

I
The consumer fraud issue raises two questions: whether this case falls within the scope of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and, if so, whether there were issues of fact precluding summary judgment. Plaintiff asserts that it was prepared to prove (1) that even though GM knew its distributors' modifications to GM engines were unsafe and defective, it permitted the GM and DDA logos to remain on the engines (and even gave written approval of the modification, although it was later retracted and the purchaser was not advised); (2) that GM and J & T concealed the defective nature of the engines after the sale; (3) that OY induced plaintiff into purchasing the yacht by knowingly and falsely representing the yacht's speed, charterability and seaworthiness; and (4) that OY covered up the yacht's fire damage and structural defects.
The judge granted defendants' pretrial summary judgment motion on plaintiff's consumer fraud claim, although the judge failed to find the facts and state his conclusions in accordance with R. 1:7-4 and R. 4:46-2. However, in an extended later exchange with plaintiff's attorney, the trial judge gave the following reasons for dismissing plaintiff's consumer fraud claim, raising additional issues to be addressed: (1) there were no facts in this case that would give rise to a consumer fraud claim based on D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11 (App.Div. 1985), and DiBernardo v. Mosley, 206 N.J. Super. 371 (App.Div.), certif. den. 103 N.J. 503 (1986); (2) if the consumer fraud claim against Ocean Yachts should be dismissed,[5] the claims against the other two parties should also *208 be dismissed;[6] (3) plaintiff failed to present any affidavits in reply to a motion for summary judgment on plaintiff's consumer fraud claim.
The Consumer Fraud Act, N.J.S.A. 56:8-2, provides:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, [sic, as to ","] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....
Any "person" who is injured "as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act" may recover treble damages, reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A. 56:8-19.[7] The Act is applicable if the nature of the transaction comes within the purview of the Act, DiBernardo, supra, 206 N.J. Super. at 375-376, and if defendants' conduct amounted to *209 an unconscionable commercial practice, D'Ercole, supra, 206 N.J. Super. at 29-31.[8]
The Act is intended to apply both to the "sale or advertisement of any merchandise or real estate," and to "the subsequent performance of such person as aforesaid." N.J.S.A. 56:8-2. The Act, therefore, can be applicable to OY as the direct seller of the yacht. Plaintiff contends that the Act also is applicable to GM, the manufacturer of the yacht's engines, and J & T, the distributor, because GM and J & T "marketed the engines under the GM and DDA label, representing through advertising and by placing this product on the market that it was a GM engine warranted by GM." Since the GM and J & T warranty was honored, this allegation properly could have been stricken. But the active concealment of known safety or significant operational problems would still have satisfied the Act. *210 After factual development, the issue might well have been decided in favor of GM and J & T, given the warranty repairs and subsequent use of the yacht; but the jury was mistakenly precluded from hearing the proofs and resolving the issue.
Plaintiff further alleges that GM and J & T later assured plaintiff that the engines were properly repaired, concealing their knowledge that the engines were defective, rendering the yacht unseaworthy. Defendants GM and J & T argue that the Act is inapplicable to their conduct because the plain language of the Act does not include the subsequent performance of a party unless that party also participated in the sales transaction, and they argue that there was an undisputed absence of literature or sales representatives from GM or J & T. Any other interpretation of the statute's words "of such persons as aforesaid", they argue, violates the legislative intent of the provision. This is, in effect, a claim of lack of privity.
Plaintiff raises three points in response. First, the case law has repeatedly emphasized that the Act is aimed not only at the "shifty, fast talking and deceptive merchant" but also at the "nonsoliciting artisan," giving credence to plaintiff's claim that the phrase "subsequent performance of such person as aforesaid" does not require defendant to be an advertiser or seller. Hyland v. Zuback, 146 N.J. Super. 407, 413 (App.Div. 1976) (Act applicable to boat repair work). Second, even if defendants' statutory construction is sound, the GM label represents significant pre-sale deceptive advertising since the engines had been altered by J & T with the knowledge of GM which revoked the GM warranty. (This second claim must be rejected, since the warranty remained effective.) Third, defendants' actions may have amounted to a "sale" under the Act, since the term "sale" encompasses any "attempt directly or indirectly to sell, rent or distribute." N.J.S.A. 56:8-1.
We note the Supreme Court's abandonment of the privity limitation in the interpretation and scope of the U.C.C. implied warranties, Spring Motors Distributors, Inc. v. Ford Motor *211 Co., 98 N.J. 555, 586 (1985), and in the warranty of good workmanship in the area of real property, Aronsohn v. Mandera, 98 N.J. 92, 98 (1984). We have no reason to limit this trend in the application of the Consumer Fraud Act, especially where the Legislature has used the expansive term "indirectly" in defining the scope of the Act's coverage. We therefore interpret the Consumer Fraud Act to encompass the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer.
The most noteworthy unconscionable practices that plaintiff claims were committed are the concealment by GM, J & T and OY of the defective nature of the engines and the concealment by OY of the yacht's fire damage and structural defects. Whether a particular practice is unlawful must be determined on a case-by-case basis. Kugler v. Romain, 58 N.J. 522, 543 (1971); Hundred East Credit Corp., supra, 212 N.J. Super. at 357.[9] Whether J & T and GM committed unconscionable commercial practices by not informing plaintiffs of the allegedly defective nature of the engines was open to question. *212 Therefore, defendants' alleged deceptive practices could not have been determined as a matter of law. The issues were for the jury.
The claim against OY based upon the initial sale as well as its alleged fraudulent concealment of fire damage should also have withstood a summary judgment motion. The case law is sparse; however, the closest factual situation is Hyland v. Zuback, supra, 146 N.J. Super. at 414-415, where the court held that a repairman had engaged in deception and misrepresentation in violation of the Act by assuring the boat owner that the repair work was progressing as planned when the work was in fact giving rise to a substantial cost overrun.
Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954), states that the party moving for summary judgment will only sustain its burden if the absence of a genuine issue of material fact is clearly shown. All inferences of doubt are to be drawn against the moving party. Id. at 75. If OY made the requisite initial showing of a lack of a meritorious claim by plaintiff, then according to R. 4:46-5 plaintiff
may not rest upon the mere allegations or denials of his pleading, but his response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him....
As noted by the trial judge, plaintiff submitted no affidavits, but plaintiff did submit a brief with extensive page references to depositions and photographs. Although all of the discovery materials were not submitted on appeal for our review, we assume that plaintiff supplied the trial court with the photographs and the depositions cited in plaintiff's brief. If the depositions were not physically before the court, the judge should have granted a brief continuance to enable plaintiff to submit the requisite documents or to have the materials reduced to certifications. After three years of discovery, it could not have been "appropriate" under R. 4:46-5 for the court merely to have granted summary judgment on plaintiff's consumer fraud claim against OY, and then state that the claims *213 against GM and J & T were derivative and strike them. There were just too many material facts raised by the photographs and depositions.

II
Two and one half days into plaintiff's case, the trial judge sua sponte also dismissed plaintiff's claims of legal fraud against all of the defendants. The parties were engaged in a dispute regarding the relevancy of testimony by David Martin, the architect of the yacht. The judge then inquired into the design defect theory of liability about which the witness was going to testify, concluding that the purpose of this theory was to increase plaintiff's damages. After a comment by plaintiff's counsel regarding the fraud count, the discussion then focused on whether OY, J & T or GM had made any fraudulent misrepresentations. Plaintiff's attorney made an offer of proof and the judge summarily dismissed all claims of fraud.[10] The judge did not give a clear statement of reasons, but the following comments have been extracted from various exchanges between the court and plaintiff's counsel:
THE COURT: Just because you let your right of rescission go by, that doesn't give you the privilege of taking another theory that costs the other manufacturer  if you let your rescission case go by, you have to live with what you got left.[11]
* * * * * * * *

*214 There is no fraud. They just didn't fix the boat.
* * * * * * * *
You tell me now that under the Uniform Commercial Code, you had two years within which to bring that action. You did not bring it, so you lost. That fraud is out.
* * * * * * * *
THE COURT: Sir, what are you talking about, a cover-up? They had to tear the boat apart to find out what was wrong.
Mr. DiRIENZO: Because Ocean Yachts taped over burnt wires, covered burnt beams, stuffed insulation over top of other items burned, put walls around things you couldn't see, unless you tore the boat apart.
THE COURT: Fine. What else rescinds the contract.
* * * * * * * *
Whether you like my decision or not, I'm not calling it a fraud. You had a right to rescind. You had a right to sue for damages at that point.
* * * * * * * *
THE COURT: I'm telling you, sir, there is no fraud in this case.
MR. DiRIENZO: How do you know, unless you hear the evidence?
THE COURT: I am accepting the representation. I heard the evidence.
MR. DiRIENZO: You heard one witness and cut off every other witness.
THE COURT: I'm telling you, sir, that there is no fraud in this case. If I'm wrong, I'm wrong. I have been wrong 
MR. DiRIENZO: Your Honor please, how can you come to that conclusion as a matter of fact?
THE COURT: Because I wear the robe.
MR. DiRIENZO: You are not a fact finder, your Honor. You are the judge of the law. You cannot determine the facts.
THE COURT: Will you stop arguing with me? I have ruled.
* * * * * * * *
I already indicated on Friday, so far as the issue of fraud is concerned, I took that out of the case, and I may add, another reason for it, so the record is *215 complete, that as I see this case, this is a purchase of a boat, commercial transaction, in which there is an expressed or an implied warranty of fitness and suitability.
On appeal, plaintiff claims that the judge was both procedurally and substantively incorrect in dismissing the fraud count.
We must first try to define the judge's action. Defendants liken his action to a summary judgment motion which might be granted sua sponte at a pretrial hearing, Sheild v. Welch, 4 N.J. 563, 567 (1950), or which can be granted when the "only proof of fraud presented by [plaintiff] was contained in its pleadings, which was rebutted by defendant['s] uncontradicted affidavits," Fablok Mills v. Cocker Mach. Co., supra, 125 N.J. Super. at 261. The flaw with this argument is that plaintiff was not given notice and an opportunity to present its proofs by affidavits or otherwise, as it would have at a summary judgment motion. To have found a failure of proof at a time when plaintiff was about to present witnesses who allegedly would have supported its claim was error. Plaintiff correctly characterizes the judge's action as an incorrectly imposed involuntary dismissal, which under R. 4:37-2(b) can be effectuated on motion by defendant only after plaintiff has presented its entire liability case. Therefore, the judge's dismissal of the fraud claims at that early stage of the proceedings was procedurally inappropriate.[12]
Notwithstanding the judge's action, we still will briefly review plaintiff's fraud allegations and attempt to reconstruct them to see whether they substantively could have withstood a proper motion, and thus possibly limit the proofs necessary at retrial. To prevail in an action claiming legal fraud, plaintiff must establish that defendant misrepresented a presently existing or past fact, that the misrepresentation was made with *216 knowledge of its falsity, that defendant intended plaintiff to rely on the misrepresentation and that plaintiff did so rely and was damaged. Foont-Freedenfeld v. Electro Protective Corp., 126 N.J. Super. 254, 257 (App.Div. 1973), aff'd o.b. 64 N.J. 197 (1974).
Plaintiff contends that GM and J & T fraudulently concealed the defects in the engine and that OY made "serious misrepresentations of the vessel's and engine's condition, and misrepresentations and affirmative conduct in concealing and covering up the vessel's condition." Defendant GM argues, however, that the trial court found that "stripped of the accompanying conclusory assertions, [the facts] were supportive of no more than a claim for breach of warranty or negligent repair."[13] Instead of separately treating each fraud claim against each defendant, the judge dismissed all of the claims. Our problem on review is that the judge had excluded possibly relevant testimony on fraud before he dismissed the claims, and by dismissing the claims before plaintiff had concluded its case precluded several witnesses' testimony that might have proven plaintiffs' fraud claim as to OY, GM, J & T or any combination of them.
J & T and GM have been accused of fraudulently concealing defects in the engine. In Weintraub v. Krobatsch, 64 N.J. 445, *217 455 (1974), the Supreme Court held that deliberate concealment of a latent defective condition material to the transaction constitutes sufficient grounds to justify rescission of a contract to purchase realty. This principle has been expanded both to include the recovery of monetary damages and to cover a range of various circumstances. See Correa v. Maggiore, 196 N.J. Super. 273, 281 (App.Div. 1984), and the cases cited therein. Plaintiff produced some evidence of its claim that GM knew that the 140mm modified engine was more likely to result in fires. While plaintiff did not elicit any testimony that J & T specifically knew that the modifications increased the risk of fire, GM warned its distributors that these modifications were at their own risk, thus giving rise to a reasonable inference that J & T knew that there was at least a serious difficulty perceived by the original manufacturer. Neither GM nor J & T notified consumers of this limitation, and GM still permitted the continual use of its logo on the engines. While plaintiff failed to produce evidence of reliance, the omission is understandable since the judge excluded the following question by plaintiff's counsel to Ted Bocra:
Mr. Bocra, if anyone had told you in the initial purchase of this boat that the engines in it were not General Motors official engineered approved engines, would you have bought the boat?[14]
Plaintiff produced several experts who testified to the faulty design of the engine and to the dangerousness of the modifications. The defective engines not only were a probable cause of the fires, but by not knowing of their defective condition, plaintiff properly contended that it was damaged by repeatedly accepting the vessel after each repair.
The most serious claim of fraud leveled against OY is that OY made misrepresentations about fire damage and took affirmative *218 actions in concealing and covering up the vessel's condition. William Bocra testified that OY promised him that the first set of repairs would be made so the yacht would be "like it was brand new, coming right off the line." Ted Bocra testified that OY represented that the original damage had been minor. Based on these statements and the appearance of the yacht, plaintiff took possession of the boat. After the second set of fires and repairs, plaintiff took possession of the boat on GM's assurances that the boat was "fixed 100%" and seaworthy, and on the threat that defendants would not be responsible for the boat if plaintiff failed to take possession. Only after later making seemingly minor repairs, the Bocras uncovered, testified to and submitted photographs of fire damage that had been painted over, covered with insulation and veneer, and burnt electrical wires that had been taped over. Plaintiff contends that Captain Daily was also prepared to testify to his observation of burned wires that had been taped and concealed.[15]
OY argues, however, that an OY representative testified that OY made the repairs to the best of its ability. Yet whether OY knowingly and intentionally made these alleged misrepresentations was a question of fact for the jury, not for summary resolution by the court. See Gardner v. Rosecliff Realty Co., 41 N.J. Super. 1, 8 (App.Div. 1956). There thus was a potential factual basis for viable fraud claims against all of the defendants.

III
Plaintiff argues that the judge incorrectly charged the jury concerning the measure of damages, limited the evidence of *219 damages in the breach of warranty claim (the only claim left in the case), and dismissed plaintiff's lost profits claim. The judge charged the jury that plaintiff "is entitled to recover the reasonable and necessary costs to be compensated for the damages that were proximately caused by the defendants' breach." The judge then told the jury that "[t]he measure of damages for such loss is the difference between the market value of the property before and the market value after the damage occurred." The judge further instructed that the cost of repairs is the appropriate measure only if that amount is less than the difference between the market value before and the market value after the damage. Defendants contend that this was an appropriate instruction and that the judge properly rejected plaintiff's position that the measure of damages should be the cost of all repairs, without reference to the original value of the yacht. Plaintiff argues, however, that the "cost to remedy the defectiveness of the vessel and engines and the damage sustained as a result of the engine fires accurately reflects plaintiffs' losses."
The U.C.C., N.J.S.A. 12A:2-714, provides, in pertinent part, for the following damages for a breach of warranty for accepted goods:
The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. [emphasis supplied].
Thus, diminution in value is the standard measure of damages in breach of warranty cases. In a few cases, however, the appropriate standard is the cost of repairs. McDonald v. Mianecki, 79 N.J. 275, 282 n. 1 (1979); see also 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 (1961) ("the cost of remedying the broken promise" is the proper measure in the case of a 5-year guarantee against leaks in roof). "The answer rests in good sense rather than in a mechanical application of a single formula." Id. at 255. The purpose of a damage award *220 "is to give the claimant the benefit of the broken promise." Id. at 256.
Plaintiff argues that it "bargained for a charterable, seaworthy vessel capable of doing 30 knots with reliable, safe engines aboard," but instead received a defective vessel. The benefit of its "broken promise" therefore would be the cost to put the vessel into the promised condition. Plaintiff's case arguably is a "special circumstances" case where the proximate damages were a "different amount" than the standard measure of damages, because plaintiff was unable to ascertain the severity of damages in the normal course of events.
Unfortunately, however, the case law which mentions the cost of repairs as a measure of damages does so as mere dictum or in the situation where the defect was "a sufficiently discrete item to permit a solution in terms of it alone." See 525 Main Street, supra, 34 N.J. at 254; and McDonald, supra, 79 N.J. at 282 n. 1. Furthermore, in Correa v. Maggiore, 196 N.J. Super. 273, 285 (App.Div. 1984), the court acknowledged that the cost of repairs can be the appropriate measure of damages, but ruled it out on the facts of that case "because the cost of repairs vastly exceeds the contract price and the probable market value of the property." As defendant GM points out, the courts are hesitant to award costs of repair that exceed the original value of the item because it would constitute economic waste. However, plaintiff at least theoretically should be entitled to the loss it actually sustained. If plaintiff successfully proves that it uncovered the damage in a piecemeal fashion which substantially raised the cost of the repairs, the original cost of the product would be an unfair measure of damages.
Even if the court applied the appropriate measure of damages, plaintiff argues that the court unfairly limited the evidence, excluding relevant testimony. We divide the excluded evidence into the following categories: (1) evidence regarding repairs stemming from the boat's "lack of seaworthiness, uncharterability *221 or safety deficiencies" (testimony excluded of David P. Martin, architect of yacht; James McCrory, marine surveyor; Captain Rookstool, hired by plaintiff to supervise repairs);[16] (2) evidence regarding the extent of the fire damage and the reasonableness of the cost of repairs (testimony excluded of Captain Rookstool; Lucille Bocra, wife of a principal; John Daily, first mate); and (3) evidence of the cost of replacing the engines (Ronald Doerr, expert in diesel engines).
Although defendants make some credible arguments justifying the limitation of evidence regarding the boat's design defects, the judge's reason for limiting this testimony repeatedly was that the testimony "would simply establish [that] the cost of the repair exceeded the amount that you paid for that boat, from the testimony that I've heard," (regarding Mr. Martin's testimony;[17] regarding Mr. McCrory's testimony; regarding Captain Rookstol's testimony and log). This was an inappropriate reason for striking this testimony. Although the judge apparently allowed the jury to consider the cost of repairing the design defects, the judge prevented the jury from effectively performing its function. Even if the judge's measure of damages were correct (i.e. a cap at $331,000),[18] by limiting this *222 testimony the jury was prevented from fully determining which repairs were necessary and which were not. Although the judge had the discretion to limit some of the testimony on the grounds that it was merely repetitive descriptions of fire-related damage, the design defect evidence was improperly excluded, since it was probative of the necessity for the repairs.
The judge, however, did not exclude any items of repair actually advanced by plaintiff:
I'm just  let me just take the facts as they are in this case. Mr. Bocra testified to damages which came to around two hundred fifty-six thousand dollars. He said carpentry seventy-five, painting a hundred ten, electricity fifty-five thousand, new heads, toilets, five thousand, water tank seven thousand, replace an overhead material four thousand and then there was testimony regarding the replacement of the windows which came to about five thousand dollars, so the total as I recall was two hundred sixty-one thousand dollars.
In addition to that, it is the plaintiff's contention that they had to replace the two motors on the boat and their dollar figure came in, the cost of that came in around eighty thousand dollars and that did not include the installation. So, as you can see the total cost exceeded the purchase price of the boat, but under our law the maximum that the plaintiff can recover would be cost of the boat less salvage value, but in this case since there's no salvage value the total cost that they seek would be three hundred thirty-one thousand dollars under the law. However, there is other testimony regarding cost of repairs. You heard Mr. Leek. Mr. Leek had testified that the boat cost three hundred fifty-three thousand five hundred seventy-five dollars. However, it was sold to the Bocra brothers for three hundred thirty-one thousand dollars. The dealer's cost was two hundred eighty-four thousand dollars. Then he spoke about repairs. I believe the repair to the rewiring came out to seven thousand some odd dollars, the cost of redecorating ninety-three hundred fifty dollars and said the total cost of the necessary repairs in his judgment was sixteen thousand. However, he added the cost of two engines which in his opinion were not required but he added that in for your consideration which came to sixty-five thousand dollars and so he had a market value  a salvage value, rather, of the boat of a hundred seventy-four thousand seven hundred and ninety dollars. So those are the figures that were testified to by the witnesses in this case concerning the element of damage which you will consider in coming to your judgment as to what dollar amount the plaintiffs are entitled to receive in this case if you find that they are entitled to a damage award.
The judge, therefore, admitted all the repair costs.
At an earlier phase of the trial, the judge fixed the cost of repairs at $256,000, not including the cost of replacing the engines. Although plaintiff contended that those repairs actually *223 cost $290,000, plaintiff's attorney failed to account for that extra $34,000. When the judge instructed the jury on plaintiff's accounting of the cost of the repairs, he added $5000 for windows, bringing the subtotal up to $261,000, plus $80,000 for the new engines.[19] The judge instructed the jury that they could award the cost of repairs as long as it did not exceed the original value of the yacht. Notwithstanding the judge's instruction, the maximum amount that the jury could have awarded for repairs based on the testimony was $341,000 which exceeded the cost of the yacht by $10,000. The jury nonetheless awarded only $181,000 in damages.
The real issue, however, is whether with full proof of the alleged design defects, additional repair costs would have been accepted. Since we do not know the answer to this question, we must also order a new trial on direct damages.[20]
The judge also excluded all evidence of incidental and consequential damages. N.J.S.A. 12A:2-714(3) provides that "[i]n a proper case any incidental and consequential damages" may be recovered. N.J.S.A. 12A:2-715 provides that the buyer may recover the following incidental and consequential damages:
(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
(2) Consequential damages resulting from the seller's breach include

*224 (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty.
The incidental damages that plaintiff incurred were the expenses "to store, operate, insure and finance the boat." None of these claims for incidental damages was developed.
Plaintiff's major claim for consequential damages involved lost profits. Lost profits may be recoverable if they can be established with a "reasonable degree of certainty." Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 314 (1954). Anticipated profits that are remote, uncertain or speculative, however, are not recoverable. Ibid. The evidence that plaintiff argues that it intended to present was
Captain Rookstool, hired to operate the vessel for charter, to testify to his past experience and success and ability to charter the vessel he captains. Plaintiffs were prepared to present business associates of the Bocras and others who had agreed to charter the vessel to entertain clients but who backed out because of the boat's reputation for problems and fires. Bocra Charter had a firm lease agreement with Perth Amboy Iron Works.
Plaintiff also submitted an accountant's report which did not estimate anticipated profits from the Bocra Charters business, although the report did,
based upon an estimate of a number of anticipated charters, which are listed in the expert report after the expert discussed with the captain the relative number of charters that could be obtained on a yacht of this sort, ... project the income and the net revenues to be determined, based on a charter fee and a number of different types of fishing trips that would be available, on a conservative basis for this yacht.
Nevertheless, the only concrete history of profits that plaintiff has to base its $124,000 claim for lost profits on is, as defendant GM noted, a demonstration fee of $300, one or two charters, a one day outing for the employees of a business owned by plaintiff, and the captive leasing arrangement with plaintiff Perth Amboy. Given this scanty history, the judge correctly excluded testimony of lost profits because there was no evidence to establish lost profits with reasonable certainty. See Seaman v. U.S. Steel Corp., 166 N.J. Super. 467, 475 (App. *225 Div.), certif. den. 81 N.J. 282 (1979) (new operation of leasing a floating crane was too uncertain to afford a basis for a claim of lost profits).

IV
This suit was originally filed in the Federal District Court to pursue remedies under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C.A. § 2301 et seq. On July 29, 1983, a federal magistrate issued a report which recommended that the case be dismissed for lack of subject matter jurisdiction. On October 7, 1983 a federal district court judge adopted the magistrate's report and recommendation and entered an order dismissing the federal court action. Plaintiff did not appeal the order.
The report recommended dismissal because in the complaint the plaintiff stated that "Plaintiff `Bocra' was incorporated in the State of Delaware on November 18, 1980 for the sole purpose of taking title to the 55 foot commercial fishing vessel and further to carry on a commercial charter fishing business." Additionally, plaintiff Perth Amboy "agreed to lease the 55 foot commercial fishing vessel for a term of one year." Also based on plaintiff's claim for lost profits, the magistrate determined that "[i]t is crystal clear on the statement of the complaint alone, that this was pure and simple a business proposition by both of the plaintiffs." The magistrate further noted that plaintiff's contention that the Bocra brothers used the yacht for private purposes was unsupported by affidavit. The magistrate recommended dismissal for lack of subject matter jurisdiction because a person who obtains goods for use in the ordinary course of business is not a consumer under the Magnuson-Moss Act, and an item purchased for commercial use is not a consumer product under the Act. 15 U.S.C.A. § 2301(1); 16 C.F.R. 701.1(b), (h).
Defendants argue that the trial judge properly dismissed plaintiff's Magnuson-Moss claims as barred by the *226 doctrine of res judicata. Plaintiff responds that the claim is not barred by res judicata because defendants failed to plead that defense, the district court's ruling was without prejudice[21] and the ruling did not address the merits of the claim.[22] The trial judge correctly resolved this issue. Res judicata is a defense which must be pleaded. R. 4:5-4. It may, however, also be raised by motion, R. 4:6-2, which may be made before or at the trial, R. 4:6-7. If not so raised, even at trial, the defense is waived. See Pressler, Current N.J. Court Rules, Comment to R. 4:6-7. Since the issue was advanced by defendants' motions prior to trial, the trial judge did not err in dismissing these claims under the doctrine of res judicata.

V
Plaintiff contends that the trial judge improperly dismissed its claims of negligence, strict liability and punitive damages. Defendants in their briefs focus exclusively on the unavailability of punitive damages under the facts of this case. Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555 (1985), held that a commercial buyer who seeks damages for economic loss resulting from the purchase of defective goods may recover for breach of warranty under the U.C.C. but not under theories of strict liability and negligence. Id. at 561. The facts in our case, like those in Spring Motors, involve a claim for economic loss as opposed to physical harm, and as such "probe the boundary" between strict liability, negligence and the U.C.C. Id. at 566, 579. Generally, the relationship *227 between a buyer and seller is determined by the law of sales, which is embodied in the U.C.C., a comprehensive statutory scheme, id. at 575; and in a claim only for economic loss a commercial buyer is limited to its remedies under the U.C.C. "against parties in the chain of distribution." Id. at 578. Thus, plaintiff's claims of strict liability and negligence were properly dismissed.
Regarding plaintiff's claim for punitive damages, such damages would not generally be awardable on a warranty theory of liability, since they are usually reserved for "civil wrongs characterized as torts," and in "the absence of exceptional circumstances [have] not been permitted in litigation involving breach of a commercial contract." Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 448-449 (App.Div.), certif. den. 71 N.J. 503 (1976); see also Ellmex Const. Co., Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 207 (App.Div. 1985), certif. den. 103 N.J. 453 (1986). Such exceptional circumstances are not present here.
However, if defendants' conduct is found to be fraudulent, the imposition of punitive damages might be warranted. Punitive damages may be awarded on fraud claims in the sound discretion of the trier of fact
[after taking] into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of the harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of damages. [Leimgruber v. Claridge Associates Ltd., 73 N.J. 450, 456 (1977)].
Thus, on remand, the trial court should examine whether the facts support a claim for punitive damages on the fraud count, and whether the usual standards for punitive damages are met.[23]

*228 VI
Plaintiff argues that the trial judge should have granted its motion for a new trial on the grounds that the jury's compensatory damage award of $181,000 was against the weight of the evidence. A jury's award of damages, however, should be disturbed "only with reluctance and never except in a clear case." Cestero v. Ferrara, 110 N.J. Super. 264, 276 (App.Div. 1970), aff'd 57 N.J. 497 (1971). Given the judge's instructions and capsulization of the testimony quoted earlier, the jury clearly could have awarded $181,000. (For example, witness John Leek testified that the total cost of necessary repairs was $16,000). Plaintiff's motion for a new trial, at least as to compensatory damages, might properly have been denied, had the proofs been admitted of the alleged design defects. However, since we cannot know the effect the preclusion of proofs may have had, a new trial even as to compensatory damages was mandated.

VII
Plaintiff claims that the judge's rulings, comments and demeanor deprived it of a fair trial. These are serious accusations, and a reading of the trial transcripts has made us fully aware of the conflict between the judge and the attorney for plaintiff. The judge erred in the manner of his addressing some of the complex issues in this case. However, plaintiff's counsel was equally strong-willed and attenuated in his arguments, even in the face of definite but adverse rulings. We trust that a different atmosphere will be created at any retrial.
The judgment is reversed, and the matter is remanded for retrial in accordance with this opinion.
NOTES
[1] Plaintiff claims that the charter company was formed only after Ocean Yachts advised it to do so; Ocean Yachts claims that the advice was given by a broker who negotiated the sale, not by Ocean Yachts itself.
[2] Plaintiff further contends against GM, although the evidence was excluded, that the modified engine had a history of unreliability and risk of fire of which GM was aware. The modified engine apparently exacerbated an underlying engine flaw, resulting in increased heat beyond the engine's cooling capacity.
[3] Examples given were charred beams covered by a thin veneer to hide underlying damage, hull charring which was painted over only in areas readily visible, separation of the hull and deckings from the supporting infrastructure, missing or collapsed baffles in the fuel tanks, and numerous other alleged problems.
[4] Although the judge fixed the cost of repairs at $256,000, not including the cost of replacing the engines, plaintiff contended that those repairs actually cost $290,000, although plaintiff's attorney failed to account for that $34,000 difference. The judge instructed the jury that plaintiff itemized its damages at $261,000 (which included an additional $5,000 for windows), plus an additional $80,000 for the new engines. Plaintiff wished to prove far greater damages, but was limited by the court.
[5] The trial judge apparently rejected the consumer fraud claim against OY because the sale of the GM engines by OY to plaintiff was not a "mass distribution" problem addressed in DiBernardo, supra. That determination is too restrictive a reading of DiBernardo which held merely that the Act was not intended to apply "to the isolated sale of a single family residence by its owner." 206 N.J. Super. at 376. This case, on the other hand, deals with a commercial seller and a mass produced engine, a large number of which plaintiff was prepared to show have also had engine failures. See also New Mea Const. Corp. v. Harper, 203 N.J. Super. 486, 501-503 (App.Div. 1985) (holding the Act specifically "applicable to a custom builder who uses substandard material in the construction of a house" and stating generally that the Act was not intended to provide "an exemption for a custom builder").
[6] Since the claims against GM and J & T were not derivative and plaintiff clearly alleged that GM and J & T committed different unconscionable acts from OY, the only reasonable explanation of this unexplained assertion by the judge is that plaintiff had a much stronger claim against OY as a seller under the Consumer Fraud Act than it did against J & T and GM.
[7] Under the Act, a person includes a "corporation." N.J.S.A. 56:8-1(d); see also D'Ercole, supra, 206 N.J. Super. at 23; Hundred East Credit Corp. v. Eric Schuster, 212 N.J. Super. 350, 355-356 (App.Div.), certif. den. 107 N.J. 60 (1986).
[8] Notwithstanding such appellate authority, the issue of the application of the Consumer Fraud Act to "warranty-type damages" has not been settled by the Supreme Court, especially in a commercial buyer setting. In Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464 (1988), another boat engine, consumer fraud case, the claim was presented in a different procedural and factual context. The Court there stated:

In view of our conclusion that the trial court's dismissal of the Consumer Fraud Act claim should be sustained, we need not resolve in this case the question of the Act's application to warranty-type damages sustained in a sales transaction induced by unconscionable commercial practices. In D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 25-26 (App.Div. 1985), the Appellate Division held that a breach of warranty in a commercial sales transaction does not necessarily constitute a violation of the Consumer Fraud Act. We have not had occasion to consider the application of the Act and its treble damages provision to warranty-type damages where the sales transaction itself was induced by unconscionable commercial practices and a breach of warranty not directly related to such unconscionable practices occurs in the course of the sales transaction. [110 N.J. at 476].
Here, unlike in Meshinsky, the breach of warranty claims were sustained against all of the defendants, and the balance of the claims were rejected before trial, thus excluding potentially relevant evidence.
[9] Note that under the Uniform Consumer Sales Practice Act, 7A U.L.A. 231, § 4(b), unconscionability of an act or practice is a question of law to be decided by the court. The court in D'Ercole, supra, analogized the Uniform Act to the Consumer Fraud Act. 206 N.J. Super. at 29-30. However, in a subsequent case where a trial judge directed a verdict in favor of plaintiffs holding that defendant's brochure violated the Consumer Fraud Act as a matter of law, we reversed. Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618 (App.Div.), certif. den. 107 N.J. 148 (1987). We stated that in the case of an allegedly unconscionable advertisement that is not covered by a specific regulation, "it must be determined through adjudication `whether the ad itself is misleading to the average consumer.'" Id. 216 N.J. Super. at 639 (quoting Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985)). We agree with Judge Skillman's statement that

[a]lthough there may be some circumstances in which an advertisement is so patently deceptive that a violation of the Consumer Fraud Act may be found as a matter of law, the determination whether an advertisement is misleading is ordinarily for the trier of fact  here the jury  to decide. [Chattin, supra, 216 N.J. Super. at 639].
[10] From the very beginning the judge and plaintiff clashed over the "law of fraud." For example:

THE COURT: You alleged misrepresentation at the time it was purchased.
MR. DiRIENZO: No, I am not. I am suggesting misrepresentation throughout a period of over two years.
THE COURT: You are alleging a fraud when he purchased the boat.
Mr. DiRIENZO: No, your Honor, I'm alleging a fraud at that time and a fraud throughout the repairs and alleged purpose of this yacht.
THE COURT: You and I don't understand the law of fraud, Mr. DiRienzo.
[11] The discussion between plaintiff's counsel and the judge, regarding the interplay between the running of the statute of limitations on the U.C.C. rescission claim and the fraud count failed to recognize (1) the tolling of the statute where the facts have been concealed by the defendant, a concept from which the discovery rule evolved; and (2) N.J.S.A. 12A:2-721 which expressly states that "[n]either rescission or a claim for rescission of the contract for sale ... shall bar or be deemed inconsistent with a claim for damages or other remedy." Furthermore, in Fablok Mills v. Cocker Mach. Co., 125 N.J. Super. 251, 260-261 (App.Div.), certif. den. 64 N.J. 317 (1973), the court further interpreted this section of the U.C.C. making fraud and warranty remedies coextensive specifically so that fraud claims will not be limited where efforts to rescind are frustrated.
[12] This is not to say that a judge who senses that an issue may be disposed of, even during trial, by a summary judgment motion or mini-trial within the case may not give the parties an opportunity to make proffers based upon certifications or even brief testimony. Cf. R. 4:46-3(a) and 4:67-2(b). This, however, was not done here.
[13] This conclusion seems to have been motivated by testimony from witness Ted Bocra, one of the principals in plaintiff company, who allegedly "totally contradicted the major allegation of fraud in the case" by stating that OY told him that the GM engines were modified by J & T. OY contends that "[a]t that point it was clear that one of the main allegations of fraud was totally discounted by plaintiffs themselves." Plaintiff contends, however, that it has "always maintained that the fraud associated with the engine modification is the intentional appearance created by defendants that the modification was approved by GM and J & T and that the engine as modified was backed up fully by GM." Since GM has fully ratified its warranty notwithstanding the J & T modifications, any fraud based upon the lack of such warranty must fall. But this disclosure does not affect plaintiff's claim that GM and J & T fraudulently concealed the defects in the engine. Just because the subject matter of one of the alleged acts of fraud was the warranty, did not mean that the whole fraud case was dependent upon the warranty claim.
[14] The question should have been permitted because contrary to the collective memories of the judge and defense attorneys, plaintiff's counsel had earlier asked this witness whether OY had told the Bocras that the modification was approved by GM and the witness answered in the affirmative, commenting that OY told them that the engines were fully warranted by GM.
[15] OY's intent to deceive may be shown circumstantially by its subsequent acts. See Capano v. Borough of Stone Harbor, 530 F. Supp. 1254, 1264 (D.C.N.J. 1982). Here, the method of repair could indicate that the damage was concealed with the intent that plaintiff not discover the extent of the damage.
[16] The necessity of Captain Rookstool's continued pay during the repair process has been forcefully challenged by defendants. Plaintiff points out, however, that the Captain's inspection efforts greatly reduced the repair costs, and although there was extensive litigation over the costs of repair, his efforts saved many times his salary. This would be an appropriate matter for jury resolution.
[17] The judge, for this reason, also refused to issue a warrant for Mr. Martin's arrest for failure to comply with a subpoena.
[18] The limitation, however, was not warranted. As noted earlier "special circumstances" may permit damages for repairs to exceed the cost of the item, N.J.S.A. 12A:2-714; and here the successive nature of the repairs might have justified application of the exception. Also, even if plaintiff attempted to prove double the cost of repairs, the jury might have accepted only half of the proof. The limitation on testimony or repair costs that exceeded the cost of the boat was in error.
[19] The necessity for replacement of the engines was a hotly contested issue. After repairs had been repeatedly made to one engine, it was replaced with a similar engine under the GM warranty. The necessity for the replacement of both engines with those of a different design was obviously rejected by the jury. Plaintiff contends that it was given competent expert advice to replace the engines which were hazardous. Defendants contend that the problem was merely a faulty gasket in the exhaust manifold and a faulty jumper line in the port engine.
[20] Since there has been no appeal from the jury's warranty liability determination, that issue need not be retried.
[21] The magistrate stated that the dismissal of plaintiff's admiralty claim, not its Magnuson-Moss Act claim, was without prejudice.
[22] The magistrate's determination that the federal courts have no subject matter jurisdiction over this Magnuson-Moss claim is a determination on the merits. Res judicata applies where the second suit involves the same parties (or their privies) and issues as the first. Brunetti v. New Milford, 68 N.J. 576, 587-588 (1975); Brick Tp. v. Vannell, 55 N.J. Super. 583, 590 (App.Div. 1959). These elements are present here.
[23] Although the claim would be one for fraud, we suggest that the trial judge employ the standards and procedure established by the Legislature for assessing punitive damages in product liability suits. N.J.S.A. 2A:58C-5.