### MAGNOLIA METAL COMPANY vs. GEORGE W. GALE.

Suffolk.    January 18, 1905. — September 11, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, LORING, & BRALEY, JJ.

*Contract. Damages. Practice, Civil,* New trial.

It is no defence to an action for breach of a contract in writing, that the contract broken by the defendant expressly cancelled a previous contract between the same parties and incorporated modifications of certain covenants and agreements contained in the first contract and that the defendant was induced to enter into the first contract by fraud and misrepresentation of the plaintiff, if the two contracts except for the modifications of the covenants mentioned were independent and distinct and did not constitute one contract.

In an action, by a corporation controlling a patented specialty called Magnolia metal, against its former selling agent for a certain territory, for breach of a con-

tract in writing by which the defendant agreed to take one hundred and twenty tons of the metal at a price named, and to use his best endeavors to dispose of a certain amount of the metal then in his hands, the obligation to take and pay for the one hundred and twenty tons to begin when the metal then in the hands of the defendant should be sold or contracted to be sold by the defendant or the salesmen working in the territory covered by the contract, if it appears that the defendant on a certain day broke the contract by notifying the plaintiff that he would no longer act under it, the plaintiff is entitled to recover the net profit which it would have made if the contract had been performed, but in arriving at this net profit it is necessary to take into account the expense to the plaintiff of completing the contract on its part, such as employing two salesmen in the territory covered by the contract, supplying the defendant with advertising matter, advertising the metal and using every effort to advance its sale, paying the defendant $25 a month for office rent, dividing the expense of a stenographer, and continuing a certain person in charge of the plaintiff's interests in Boston so long as he was connected with the company and the contract remained in force, all of which things were required of the plaintiff by the terms of the contract.

When, after a verdict for the plaintiff in an action of contract, exceptions of the defendant are sustained on a ground relating only to the question of damages, the new trial will be confined to the matter of damages only.

CONTRACT for an alleged breach of a contract in writing. Writ in the Supreme Judicial Court dated July 15, 1903.

The case was referred to Causten Browne, Esquire, as auditor. He found that the damages sustained by the plaintiff, if it was entitled to anything, were $22,452.84. He disallowed the claim of the plaintiff for interest from the time of the defendant's repudiation of the contract. Later the case was tried before *Braley*, J. It appeared in evidence that the Magnolia metal mentioned in the contract was a patented specialty entirely controlled by the plaintiff, that it had no price upon the market, and that the price at which it was sold was at all times arbitrarily fixed by the plaintiff.

The jury made the following special findings:

Question No. 1. Was the contract in suit procured by the fraud or misrepresentation of the plaintiff? The jury answer, No.

Question No. 2. Did the plaintiff, before January 22, 1901, violate any of the terms and conditions of the contract in suit which, on its part, it had agreed to perform? The jury answer, No.

The jury found for the plaintiff against the defendant George W. Gale, there having been two other defendants, and assessed

damages in the sum of $23,418.01. The defendant George W. Gale alleged exceptions.

The contract on which the action was brought was as follows:

"This agreement made and entered into this twenty-sixth (26th) day of June, Nineteen Hundred (1900), between the Magnolia Metal Company, a corporation duly organized and existing under and by virtue of the Laws of the State of West Virginia, with principal offices at 266–267 West Street, New York City, hereinafter called the 'Company,' party of the first part, and Drew & Gale, Merchants, of 191 High Street, Boston, Massachusetts, and George W. Gale, Merchant, of Cambridge, Massachusetts, hereinafter called the 'Agents,' parties of the second part; Witnesseth:

"Whereas, the parties hereto have heretofore, and on the twenty-second day of September, One thousand eight hundred and ninety-nine (1899) entered into a contract of sale and agency; and Whereas the said Agents have now on hand in Boston, as their property Seventy-one thousand one hundred and thirty (71,130) pounds of Magnolia metal, shipped them under the said contract of September twenty-second, One thousand eight hundred and ninety-nine (1899), and have also on hand Ninety-seven thousand nine hundred and fifty-two (97,952) pounds of Magnolia metal shipped them under the said contract, and for which they have paid, which said amount of Ninety-seven thousand nine hundred and fifty-two (97,952) pounds of Magnolia metal is subject to be returned to the Magnolia Metal Company under the terms and conditions of the said contract of September twenty-second, One thousand eight hundred and ninety-nine (1899); and Whereas the said Agents have in their possession the said One hundred and sixty-nine thousand and eighty-two (169,082) pounds of Magnolia metal, which they are not able to dispose of at once; and Whereas it is desirable that the contract relations heretofore existing between the parties hereto be changed, Now Therefore:

"In consideration of the premises and the further sum of One Dollar ($1) to each in hand paid by the other, the receipt whereof is hereby acknowledged, it is hereby mutually agreed as follows:

"1. The said contract, dated September twenty-second, One

thousand eight hundred and ninety-nine (1899) is hereby cancelled, and each party relieved from further liabilities thereunder.

" 2. The said Agents, having on hand One hundred and sixty-nine thousand and eighty-two pounds of Magnolia metal, hereby relieve the Company from all liability as to the return of the said Ninety-seven thousand nine hundred and fifty-two (97,952) pounds of Magnolia metal, as provided under the said contract of September twenty-second, One thousand eight hundred and ninety-nine.

" 3. The said Agents hereby covenant and agree to purchase from the said Company, one hundred and twenty (120) tons of Magnolia metal (twenty-two hundred and forty pounds to the ton) within the twelve months (12) beginning with the date when the said One hundred and sixty-nine thousand and eighty-two (169,082) pounds of Magnolia metal shall be sold, either for immediate shipment, or contracted to be sold for future delivery.

" 4. The said Agents shall use their best endeavors to dispose of the Magnolia metal now on hand, and the Company shall retain two (2) salesmen in the territory covered by this contract, who shall work in conjunction with the said Agents; and the year during which the one hundred and twenty (120) tons of Magnolia metal are to be taken shall begin and run from the date that the said one hundred and sixty-nine thousand and eighty-two (169,082) pounds of Magnolia metal shall be sold or contracted to be sold by the said Agents, or the said salesmen working in said territory.

" 5. The said Agents hereby covenant to take the said One hundred and twenty (120) tons of Magnolia metal (twenty-two hundred and forty pounds to the ton) within the said twelve (12) months, in deliveries of ten (10) tons per month.

" 6. The following covenants and agreements contained in the contract of September Twenty-second, One thousand eight hundred and ninety-nine, (1899) are hereby renewed, with certain modifications, viz :

" 7. The said Agents shall have the sole and exclusive Agency, from this date up to the end of the said twelve (12) months, for the sale of Magnolia metal in the States of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and

Maine, and shall have the option, at the expiration of the said period of twelve (12) months, to renew this agency for one year thereafter, on the same terms and conditions as are herein contained.

"8. It is understood that the meaning of the words 'sole and exclusive agency' used in paragraph 7 of this agreement, is that the Company will sell the Magnolia metal exclusively to and for the said Agents, who are to act as general selling agents for the territory above mentioned, and will sell to others only under the direction of the said Agents, and for the account of the said Agents, and the Company will also use every reasonable endeavor to prevent parties outside of the States above mentioned from shipping Magnolia metal into the said States; but they cannot be held responsible or accountable for any such shipments as may be made by outside parties in the ordinary course of trade.

"The Company, however, reserves the right to sell Magnolia Anti-Friction Metal, for shipment into the States of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine, for account of the Agents; but in all such cases the Company agrees to allow the Agents a special commission on such sales, this commission to be equivalent to the difference between the price charged by the Company on such sales and their price to the Agents under this agreement, but in no case shall the commission be less than five per cent. (5%) to be figured upon the special invoice price of sixteen and two-tenths (16.2) cents per pound net; and the Agents are to be credited under this contract with the quantity of metal so shipped, which is to be deducted from the next future shipment; and the Company further agrees that if any Magnolia metal should be shipped into the territory covered by this agreement, by parties outside of the above mentioned States, and such shipment can be proved, the Company will allow a commission of five per cent. (5%) on the invoice value of same, it being understood that such shipments are to be entirely outside of the quantity of Magnolia metal stipulated for herein.

"If the said Company should sell any of the said one hundred and sixty-nine thousand and eighty-two (169,082) pounds of Magnolia metal now in possession of the Agents, to parties

outside of the States herein mentioned, then, and in that event, the Agents shall receive thereon a commission of ten per cent. (10%) on the invoice price of sixteen and two-tenths (16.2) cents per pound, that is, the Company shall pay the Agents for such metal, the sum of sixteen and two-tenths (16.2) cents per pound, plus ten per cent. (10%) thereof.

" 9. In consideration of the agency mentioned in paragraph 7 of this agreement, and also in consideration of the special commissions to be paid, as set forth in paragraphs 8, 10 and 14 of this agreement, and the further undertaking on the part of the Company to send two (2) representatives, who shall devote their time to assisting in the work of selling Magnolia metal in the States of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine, all of the necessary expenses of these two men to be borne by the Company; it is understood and agreed that the Agents shall order manufactured, and they do hereby purchase of the Company a minimum quantity of one hundred and twenty tons (120) or say two hundred and sixty-eight thousand eight hundred (268,800) pounds of Magnolia metal, at the special contract price of twenty-five (25) cents per pound less twenty per cent. (20%) less ten per cent. (10%) say eighteen (18) cents per pound free on board Boston.

" 10. It is understood, and a part of this agreement that in consideration of special efforts to be made on the part of said Agents, the Company hereby agrees to allow to the Agents, a special commission of ten per cent. (10%) on the invoice value of all the Magnolia metal ordered under this agreement; such special commission to be deducted from the amount of invoices at settlement.

" 11. The terms of settlement under this agreement are to be ninety (90) days acceptance against such shipment, without interest, or, if preferred by the Agents, two per cent. (2%) discount for cash in ten (10) days. If the Agents elect to send acceptances they are to do so promptly upon receipt of the metal and invoice, or notify the Company that they will discount the bill, less two per cent. (2%) at the end of ten (10) days.

" 12. In consideration of the agency, the Company hereby agrees to supply the said Agents liberally with advertising

matter and also to thoroughly advertise and use every reasonable effort to advance the sale of Magnolia metal in the territory covered by this agreement, and also agrees to send two (2) representatives who shall devote their time, during the life of the contract, to selling Magnolia metal in the States above mentioned, and who will work the trade in these States, in conjunction with, and under the guidance of the Agents, and who will turn over to the said Agents all orders taken by them for Magnolia metal during the period of this contract.

"13. The Magnolia metal to be supplied by the Company, under this contract, is to be of the same quality as that tested by the United States Navy Bureau, and for which certificates were granted on the thirtieth day of March, one thousand eight hundred and eighty-eight (1888).

"14. In consideration of the special commissions to be paid the Agents under this agreement, it is understood and agreed that the said Agents are not to cut prices, but are to maintain the regular schedule of prices of the Company, which schedule, marked ' Exhibit A,' is hereto annexed and made a part hereof; but should there be any large special trade, like that of railroads, etc., which requires a special price, such special price is to be considered between the Company and the Agents, and the Company, if it is to their advantage to do so, is to make a special price to any such large trade, and the said Agents will, in that case, receive a special commission of five per cent. (5%) from the Company on such special invoice price as may be made. The obligations of this paragraph shall apply not only to the period covered by this contract, but to all Magnolia metal purchased of the Company, by the Agents, and which they may have on hand at the termination of this contract.

"15. It is further understood and agreed, by and between the parties hereto, that the Agents shall supply the Company with a list of all the sales they make, and that the Company shall also supply the Agents with a list of all the sales they make for account of the Agents.

"16. It is further understood and agreed by and between the parties hereto, that the said Agents shall supply the Company with proper desk room, and also with such signs as may be necessary to properly advertise the Magnolia Anti-Friction

Metal locally ; and the Company hereby agrees to pay to the Agents the sum of twenty-five dollars ($25) per month for office rent during the period covered by this contract.

" 17. The Company further agrees to allow the said Agents the sum of five hundred dollars ($500) in lieu of the commission of five per cent (5%), which would have 'accrued to the Agents on certain unsold metal, under the contract of September twenty-second, one thousand eight hundred and ninety-nine.

" 18. The Company will agree to divide with the said Agents the expense of one stenographer at Boston.

" 19. The Company further agrees to continue Mr. W. H. Lent in charge of their interests at Boston, so long as that gentleman is connected with the said Company, and this contract remains in force.

" 20. It is mutually understood and agreed that wherever the word ' Company' is used in this agreement it shall mean and include the assignees or successors of the said Company, and that wherever the word ' Agents' is used, it shall mean and include the assignees and successors of the said Agents.

" In witness whereof, the party of the first part has caused its official seal to be hereto affixed, and these presents to be signed by its Vice-President, and the parties of the second part have hereunto affixed their hands and seals, at the City of New York, the day and year first above written.

" Magnolia Metal Co.

[Seal.]                           E. C. Miller,

Vice-Prest.

Drew & Gale.

Edward E. Drew.

Willard M. Gale.

George W. Gale."

*G. F. Piper*, (*W. H. Thorpe* with him,) for the defendant.

*G. F. Ordway*, for the plaintiff.

MORTON, J.   This is an action for the breach of a written contract dated June 26, 1900.   The defendant notified the plaintiff on January 22, 1901, that he would no longer act under the contract, and this was the breach relied on.   It was admitted that from that date the contract was no longer in force.   The defences relied on were that the contract was procured by fraud

and misrepresentation on the part of the plaintiff, and that the plaintiff had violated certain terms and conditions on its part to be performed. There had been a previous contract between the same parties dated September 22, 1899, which was expressly cancelled and the parties relieved from further liability thereunder by the contract in suit. The fraud and misrepresentation relied on related to the first contract and the first exception is to the refusal of the justice to rule as requested that the second contract was a continuation of the first and that the two should be read together, and that the plaintiff was not entitled to recover on the contract in suit if the defendant was induced to enter into the first one by the fraud or misrepresentation of the plaintiff as its duly authorized agent. It is too plain for argument that this request was rightly refused. Save as the second had incorporated into it with certain modifications certain covenants and agreements contained in the first, the two were independent and distinct. The second was not a continuation of the first and the two together did not constitute one contract or agreement. This exception is overruled.

The next and remaining exception is to the refusal of the justice to rule as requested that in estimating the damages, if any, which the plaintiff was entitled to recover, such expenses as the plaintiff would have been subjected to in carrying out the contract on its part were to be deducted from the profit, meaning thereby, we assume, the gross profit, which would have accrued to it under the contract. We think that this instruction should have been given. The plaintiff was not entitled to be put in a better position by reason of the breach than it would have been in if the contract had been carried out by the defendant. The damages are to be assessed on the footing of what the plaintiff's profits would have been if the contract had been carried out by the defendant according to its terms, and the plaintiff is to be made whole for what he has thus lost by the defendant's breach. The jury properly were instructed that the plaintiff was entitled to recover the net profit which it would have made if the contract had been performed. But in order to arrive at that it was necessary to take into account the expense to the plaintiff of completing the contract on its part. It cannot have the same benefit of the contract that it would have had, if it had been

fully performed, and at the same time avoid the expense. to which, according to the terms of the contract, it would have been subjected by performance. To allow such expense to be ignored in the estimation of the damages would be putting the plaintiff in a better position than it would have occupied if the contract had been fully performed. See *Noble* v. *Ames Manuf. Co.* 112 Mass. 492; *Fox* v. *Harding*, 7 Cush. 516; *Masterton* v. *Mayor of Brooklyn*, 7 Hill, 61; Sedg. Damages, (8th ed.) § 609. According to the terms of the contract the plaintiff was to employ two salesmen in the territory covered by the contract, to supply the defendant with advertising matter and to advertise the metal and use every effort to advance its sale, to pay the defendant $25 a month for office rent during the period covered by the contract, to divide with the defendant the expense of one stenographer at Boston, and to continue Mr. W. H. Lent in charge of their interests at Boston so long as he was connected with the company and the contract remained in force. It would have been subjected to expense in regard to all of these matters if the contract had been performed, and in estimating the damages such expense should be taken into account. The fact that such expense may be difficult of estimation is far from being a sufficient reason for disallowing it altogether. As said by Barker, J. in *Cutter* v. *Gillette*, 163 Mass. 95, " It is not the law that damages which may be larger or smaller because of such uncertainties are not recoverable. The same kind of difficulty is encountered in the assessment of damages for personal injuries. All the elements which bear upon the matters involved in the prognostication are to be considered by the jury, and from the evidence in each case they are to form an opinion upon which all can agree, and to which, unless it is set aside by the court, the parties must submit." See also *Daniell* v. *Boston & Maine Railroad*, 184 Mass. 337, 343. The rule of damages is not affected by the motive which the defendant had for breaking the contract or by the fact that he chose, without any sufficient excuse, to break it rather than go on with it. We understand the phrase " so long as . . . this contract remains in force " used in connection with the plaintiff's agreement to continue Mr. Lent in charge at Boston to refer not to a possible breach, but to mean so long as the contract continues in force if performed according to its terms.

The result is that the exceptions must be sustained. But inasmuch as the exceptions that are sustained relate only to the question of damages the new trial will be confined to the matter of damages only.    *Whipple* v. *Rich*, 180 Mass. 477.    *De Forge* v. *New York, New Haven & Hartford Railroad*, 178 Mass. 59, 64.

> *Exceptions sustained; new trial granted but on the matter of damages only.*