723 A.2d 976 (1998)
MAGNET RESOURCES, INC., Plaintiff-Respondent/ Cross-Appellant,
v.
SUMMIT MRI, INC., Defendant-Appellant/ Cross-Respondent,
Magdy Elamir, M.D., Mohamed Hanafy, and Kennedy MRI, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted September 29, 1998.
Decided December 16, 1998.
*978 Gallo & Gallo, Ridgewood, for defendant-appellant/cross-respondent (Kenneth T. Gallo, of counsel and on the brief).
Carpenter, Bennett & Morrissey, Newark, for plaintiff-respondent/cross-appellant (Robert J. Stickles, of counsel; Marc E. Wolin, on the brief).
Before Judges PRESSLER, BROCHIN and KLEINER.
*977 The opinion of the Court was delivered by BROCHIN, J.A.D.
This appeal arises from a breach of contract action. The two legal issues of particular importance with which we deal are: (1) the right of a contracting party that reasonably deems itself insecure because of the other contracting party's threatened material breach to demand concrete assurances of performance and to suspend its own performance pending their receipt; and (2) the extent, if any, to which a contracting party injured by the other party's material breach is entitled to include overhead and other fixed costs as part of its recovery of lost profits.
Plaintiff Magnet Resources, Inc. ("Magnet Resources") and defendant Summit MRI, Inc. ("Summit") each charged the other with a material breach of contract and sued for damages. Magnet Resources also sought damages from two officers of Summit, defendants Magdy Elamir, M.D., and Mohammed Hanafy, on the ground that they had induced Magnet Resources to continue performance of its agreements by fraudulent promises of payment. On pretrial motions for summary judgment, the claims against the individual *979 defendants were dismissed and a partial summary judgment was entered in favor of Magnet Resources for $6,800. The parties' other breach of contract claims were tried to a jury. The jury found that both parties had breached, and it awarded $492,320 to Magnet Resources and $18,470 to Summit. Summit has appealed and Magnet Resources has cross-appealed.
Summit did not object to the trial court's jury instructions. However, it argues to us that the instructions were incomplete and misleading because the jury was not told that one party's material breach relieves the other party of its duty to perform. It also contends that the charge was erroneous because the jury was not instructed that, in determining damages, it should consider that the parties might have agreed to terminate their contracts before the expiration of their terms, and that Magnet Resources had the burden of proving that its overhead was fixed. In addition, Summit asserts that the court unduly limited Magnet Resources' duty to mitigate. Summit also argues that the court should have granted its motion for judgment notwithstanding the verdict because Magnet Resources failed to sustain its burden of proving that its overhead was fixed, that the trial court abused its discretion by permitting Magnet Resources to reopen its case to provide additional testimony of its accountant to show that its overhead was fixed, and that the accountant should not have been permitted to offer that testimony because it was beyond the scope of his report.
Magnet Resources contests the entry of summary judgment dismissing its fraud claims against Dr. Elamir and Mr. Hanafy. Without having moved for judgment notwithstanding the verdict or for a new trial on damages, Magnet Resources also argues that "as a matter of law, [its] damages should be increased from $492,370 to $611,863," the full amount of its damage claim.
Magnetic resonance imagers ("MRIs") are devices used by physicians and hospitals for diagnostic purposes. Magnet Resources sells and services new and used MRIs. Summit operated MRI installations in Jersey City, Paterson and Irvington, New Jersey.[1] Magnet Resources contracted with Summit to provide preventive maintenance and emergency repair services for the MRIs at Summit's Paterson and Irvington installations. Magnet Resources also supplied cryogens[2] for all of Summit's installations, including its Jersey City installation.
The charge for the services to be provided for the Irvington installation was $120,000 for the first year and $150,000 annually for subsequent years of the contract. Payments were to be made monthly in advance beginning with the fourth month of the contract. The testimony of both parties implies that there was a separate service agreement for the Paterson installation with terms similar to those of the Irvington contract, but the Paterson contract was not offered into evidence.[3] However, neither party attaches any significance to this omission. For purposes of the case, both parties treated the service agreements for the two sites as a single contract, and we will do the same.
Summit's monthly payments were habitually late. On May 10, 1994, Magnet Resources faxed a memorandum to Summit complaining that seven of its checks had been dishonored.[4] The memorandum declared that thereafter payments more than ten days late would have to be made by certified check, the provision of the service contracts imposing a surcharge for late payment would be enforced, and neither essential supplies nor emergency service would be provided except under special arrangements if an invoice was late by thirty days or more. On June 7, 1994, Magnet Resources faxed a memorandum to Summit complaining that it had still not received a $13,250 payment due for April.
*980 On December 20, 1994, Summit requested repair service for its Jersey City installation. Magnet Resources had no contract for emergency service or preventive maintenance for that site. It declined to provide the service because Summit then owed it $35,000. Summit promised that if the necessary work was done, Magnet Resources would get "most of the money by the end of the week." In reliance on that promise, Magnet Resources installed a necessary piece of equipment from its inventory for a total charge of $8,750.
Neither that charge nor the other unpaid bills had yet been paid when Summit called a Magnet Resources service person at his home on Saturday, December 24, requesting immediate emergency service for its Paterson installation. Under its service contract, however, Summit was entitled to service only from Monday through Friday. Magnet Resource did not make the emergency repair.
On Tuesday, December 27, Summit still had not paid its outstanding bills to Magnet Resources. That day, the person in charge of Summit's Paterson facility telephoned Magnet Resources and urgently requested service for that site. The caller was informed that Magnet Resources would not respond because of Summit's continuing failure to pay overdue bills.
The director of Summit's centers called Ronald Hynes, Magnet Resources' president. The amount due and unpaid was then more than $40,000. Summit offered $10,000 if the emergency service problem was taken care of. Hynes refused; he decided to suspend service until "things were improved, or somebody talked to us [Magnet Resources] and made some arrangements." He faxed a memorandum to Summit which referred to the previous week's payment promise and declared, "[W]e have suspended service to each site where payment is overdue." The suspension was effective December 27.
Some time after the suspension of service, Hynes spoke with Hanafy and complained that Summit had ordered cryogens from Magnet Resources' supplier on Magnet Resources' credit. Summit responded that it had made arrangements to have another company provide service for its sites. Summit changed the locks on its MRI installations to bar access by Magnet Resources' service personnel who previously had been able to enter to service the MRI's after regular business hours.
At trial, Magnet Resources' accountant, Thomas J. Veth, testified to the amount of anticipated profit it had lost as the result of Summit's cancellation of the contract. According to Veth, Magnet Resources had invoiced Summit $207,500 for services at the Irvington and Paterson installations in 1994. Of those amounts, direct costs, i.e., total costs for direct labor, supplies used for the particular job, and costs of service personnel going to and from the installations to perform their work, were $96,228 for the two sites. He calculated $6,000 as the cost of fringe benefits for the employees servicing the installations. Veth determined the gross profit ("gross" because it was calculated without deducting overhead) and calculated Summit's gross profit percentage (i.e., gross profit divided by gross revenue) for each installation. He then calculated the total amount of revenue which would have been invoiced in the future for work at each site if the contracts had not been canceled. Multiplying those figures by the gross profit percentages, Veth concluded that if the contracts had not been canceled, Magnet Resources would have realized a gross profit of $559,821 on both contracts through their scheduled termination dates. Veth then added $32,500, the amount invoiced and unpaid for completed work. These figures, anticipated but unrealized gross profit and amounts invoiced but unpaid for completed work, totaled $592,321. Veth testified that the rounded-off present value of $592,321, calculated to June 10, 1997, which was close to the day the trial commenced, was $611,000. Magnet Resources claimed that amount as its damages.
After Magnet Resources had rested, Summit moved to limit Magnet Resources to the recovery of no more than one dollar in damages on the ground that it had failed to sustain its burden of proving that no part of its overhead expenses should be deducted from its anticipated gross profit to calculate its damages. The court agreed that Magnet Resources had the burden of proof on that issue and that it had failed to offer the *981 necessary proof, but the court permitted Veth to be recalled to supply the missing evidence. Veth then testified that unallocated indirect costs and overhead expenses, such as rent, secretarial salaries, and officers' salaries, were not deducted from gross profits to calculate Magnet Resources' damages because Summit's termination of its contracts did not avoid or reduce those expenses. Veth further testified that the termination of the Summit contract did not free up any of Magnet Resources' productive capacity to create additional revenue.
Summit presented Mohammed Hanafy as its expert accounting witness. He testified that Summit sustained a loss of $28,968.75 when Magnet Resources' failure to repair the MRI machine at its Paterson center in December 1994 left the machine inoperable. Hanafy also disputed Magnet Resources' damage claim. He defined overhead costs to include selling, administrative, advertising, travel and entertainment expenses, taxes, bad debts, commission and interest. He expressed the opinion that Magnet Resources should have allocated these overhead costs to servicing the Irvington and Paterson installations in proportion either to direct labor costs or to some other criterion, and that the allocated overhead should have been deducted from gross profits to calculate the amount of anticipated profits lost because of the cancellation of the servicing contract. On that basis, Hanafy concluded that Magnet Resources' lost profit was $38,171, rather than the $611,000 testified to by Veth.

-1-

Failure to ask the jury whose breach was material
It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance.[5]Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990); Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 341, 173 A.2d 258 (1961); Duall Bldg. Restoration, Inc. v. 1143 East Jersey Avenue Assocs., 279 N.J.Super. 346, 364, 652 A.2d 1225 (App.Div.1995); Restatement (Second) of Contracts § 237 (1981). Neither Summit nor Magnet Resources asked the trial court to charge that proposition, and neither objected to the omission of that charge. Summit is therefore not entitled to a new trial because of this omission unless it constituted "plain error," R. 2:10-2, capable of producing an unjust result. Gaido v. Weiser, 227 N.J.Super. 175, 198, 545 A.2d 1350 (App.Div.1988); Gluckauf v. Pine Lake Beach Club, Inc., 78 N.J.Super. 8, 26, 187 A.2d 357 (App.Div.1963); Procanik v. Cillo, 206 N.J.Super. 270, 292, 502 A.2d 94 (Law Div.1985).
"Material breach" has been described as follows:
Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to "defeat the purpose of the contract." [citation omitted] In applying the test of materiality to such contracts a court should evaluate "the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be repeated." [citation omitted]
[Medivox Productions, Inc. v. Hoffmann-La Roche, Inc., 107 N.J.Super. 47, 59, 256 A.2d 803 (Law Div.1969).]
See Restatement (Second) of Contracts §§ 241 and 242. In the present case, there was evidence of three events or series of events which could arguably have constituted material breaches. In their order of occurrence, these were, first, Summit's continual late payments and, at the end, its failure to pay for either two or three months' service and for emergency service at Jersey City that was not covered by the contracts; second, Magnet Resources' failure and refusal to provide service for the Paterson installation beginning December 24, 1994; and third, Summit's cancellation of the service contracts the following week.
*982 Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions. Lo Re v. Tel-Air Communications, Inc., 200 N.J.Super. 59, 72-73, 490 A.2d 344 (App.Div. 1985); De Ponte v. Mutual Contracting Co., 18 N.J.Super. 142, 146, 86 A.2d 785 (App.Div. 1952); E.I Dupont De Nemours Powder Co. v. United Zinc & Chemical Co., 85 N.J.L. 416, 418, 89 A. 992 (Sup.Ct.1914). However, the court's failure to pose those questions to the jury would have been prejudicial to Summit only if the jury could have found that Magnet Resources' refusal to provide service at the Paterson installation was a material breach which justified Summit's canceling the contract.
Magnet Resources has argued to us that its refusal to provide service was not a material breach because Summit's non-compliance with its payment obligations was itself a prior material breach that excused it from any further duty of performance. Cf. Zulla Steel, Inc. v. A & M Gregos, Inc., 174 N.J.Super. 124, 131-32, 415 A.2d 1183 (App. Div.1980). Summit's non-compliance indisputably breached the contract. But Magnet Resources, by declaring a suspension and not a cancellation of its undertaking to service Summit's facilities, implied its willingness to resume service upon payment and, perhaps, upon adequate assurance of timely future payments. That statement of its implied readiness to continue the contract waived the materiality of the breach; that is, it precluded Magnet Resources from successfully relying on Summit's payment history to excuse its refusal to provide service. See Garden State Bldgs. v. First Fidelity Bank, 305 N.J.Super. 510, 525, 702 A.2d 1315 (App.Div. 1997), certif. denied, 153 N.J. 50, 707 A.2d 153 (1998); Ballantyne House Assocs. v. City of Newark, 269 N.J.Super. 322, 334, 635 A.2d 551 (1993).
Nonetheless, Magnet Resources had the legal right to do what it said it was doing, suspend its performance pending Summit's cure of its defaults within a reasonable time. Magnet Resources was a relatively small company. It did not contract to extend credit. Just the opposite. Its contract called for payment in advance. After repeatedly failing to make payments when they were due, Summit promised to pay most of what it owed. When Summit failed to keep that promise, perhaps Magnet Resources would have been entitled to treat Summit's failure as a material breach. It did not do so. Instead, in order to avoid extending further credit which had not been bargained for, it withheld further performance of its contractual obligations until it had received either the payment that was due or reasonable assurances that payment would be promptly made. For the following reasons, we conclude that as a matter of law, this suspension of performancerefusing service at Paterson beginning December 24did not materially breach Magnet Resources' contractual obligations.
Section 251 of the Restatement (Second) of Contracts has been accepted as part of New Jersey law. Lo Re, supra, 200 N.J.Super. at 70-73, 490 A.2d 344. It has also been widely accepted in other jurisdictions. Marvel Entertainment Group, Inc. v. ARP Films, Inc., 684 F.Supp. 818, 820-21 (S.D.N.Y.1988); United Corp. v. Reed, Wible & Brown, Inc., 626 F.Supp. 1255, 1257-58 (D.Vi.1986); Conference Ctr. Ltd. v. TRCThe Research Corp. of New England, 189 Conn. 212, 455 A.2d 857, 863-64 (Conn.1983); Drinkwater v. Patten Realty Corp., 563 A.2d 772, 776 (Me. 1989); Julian v. Montana State Univ., 229 Mont. 362, 747 P.2d 196, 199-200 (Mont. 1987); Juarez v. Hamner, 674 S.W.2d 856, 861 (Tex.App.1984).
Section 251 states:
(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.
*983 The Comment to this section explains that an obligee of an executory promise "who believes, for whatever reason, that the obligor will not or cannot perform without a breach, is always free to act on that belief" by withholding his own performance. But if he cannot prove that his belief was correct, his non-performance may itself be a material breach of the contract, making him liable for damages. The Comment continues:
This Section affords him an opportunity, in appropriate cases, to demand assurance of due performance and thereby avoid the uncertainties that would otherwise inhere in acting on his belief. If it is then reasonable for the obligee to suspend his own performance while he awaits assurance by the obligor, he may do so under Subsection (1).... If the obligee does not, within a reasonable time, obtain adequate assurance of due performance, he may under Subsection (2) treat the obligor's failure to provide such an assurance as a repudiation.
Significantly for the present case, Summit's failure to pay in accordance with its contract or with the promise by which it induced the provision of emergency service for the Jersey City facility did not have to amount to a material breach in order to have entitled Magnet Resources to demand assurances that Summit would comply with its obligations and to suspend performance for a reasonable time until those assurances were forthcoming. Carfield & Sons, Inc. v. Cowling, 616 P.2d 1008, 1010 (Colo.Ct.App.1980), illustrates this proposition. The plaintiff, Carfield, as general contractor, agreed to erect a steel building for the owner, Schmoll. Carfield engaged a subcontractor, Krug, to pour the concrete foundation and floor. Before the concrete floor had fully cured, one of Krug's employees drove a gravel truck onto it. The owner demanded that the floor be replaced. The general contractor could detect no damage. He offered the owner a one-year written guarantee on all materials and workmanship for the floor, but refused to replace it. By various expedients the general contractor proposed to adopt, the building could have been completed on time and any necessary repairs could have been made. But the owner directed that no weight be put on the concrete floor for an additional seven days, demanded replacement of any damaged concrete, and stopped a $15,000 check. The general contractor asserted that the owner was in breach, stopped work, removed the building, and sold it to mitigate damages. The concrete was not in fact damaged by the gravel truck. Subsequent tests showed that its bearing capacity exceeded the contract requirements. Remanding the case to determine whether the general contractor had offered adequate assurances of performance, the appellate court held:
The breach of contract by Krug (and thus by Carfield) in not insuring that the driver of the gravel truck stayed off the concrete floor does not terminate Schmoll's obligations under the contract unless "that breach is a major breach going to the essential condition of the contract." [citation omitted] No such breach occurred in this case because the concrete was not damaged. However, we interpret the trial court's findings to mean that Schmoll reasonably believed that such a breach had occurred. Therefore, we conclude that in order to avoid liability under the contract, Schmoll was obligated to request adequate assurance of performance. If Carfield then refused to provide that assurance, Schmoll could treat the contract as terminated.
[Ibid.]
See also Julian, supra, 747 P.2d at 199.
Kunian v. Development Corp. of America, 165 Conn. 300, 334 A.2d 427 (Conn.1973), illustrates the application of § 251 to facts closely analogous to those of the present case. Although Kunian was decided on the basis of § 2-609 of the Uniform Commercial Code, it is an appropriate guide to the decision of the present case because, according to the Comment to Restatement (Second) of Contracts § 251, that section is "a generalization, applicable without regard to the subject matter of the contract, from [the rule stated in] Uniform Commercial Code § 2-609."
The contract in Kunian provided for A. Merowitz and Company, Inc. to sell and deliver plumbing and heating supplies for a *984 total cost of $358,381 to DCA Builders, a general contractor building a low cost housing project. The deliveries were to be made to the job site when and as ordered by the contractor. Materials delivered before the fifteenth of the month were to be paid for on the twenty-fifth; materials delivered between the fifteenth and thirtieth were to be paid for on the tenth day of the following month. The contract also provided that DCA Builders could take a two percent discount if it complied with these payment terms. From approximately March 18, 1969 to October 31, 1969, DCA Builders paid all amounts invoiced for materials received except for $7,502.75. A. Merowitz continued to deliver materials despite the indebtedness and, by November 26, 1969, the contractor owed approximately $38,000. On December 12, 1969, A. Merowitz met with DCA Builders and insisted on full payment, but received only $5,000. However, DCA Builders promised to make payments during January 1970 to reduce its debt, provided that A. Merowitz continue to deliver materials as ordered. The seller complied, but the contractor did not make any further payments either to reduce its indebtedness or for the new deliveries. In early January 1970, DCA Builders began purchasing plumbing and heating supplies from another source; however, on January 14, 1970, it wrote A. Merowitz demanding delivery of the balance of the supplies due under its contract. DCA Builders had not performed its previous promise to make payments on what it already owed. In response to DCA Builder's January 14 letter, A. Merowitz stated that it would deliver the balance of the required materials but, in view of the large indebtedness outstanding, only if DCA Builders deposited sufficient cash in escrow to pay for the delivered materials. When DCA Builders refused to comply by January 27, 1970, A. Merowitz ceased making deliveries. DCA Builders then owed A. Merowitz approximately $51,000; materials previously delivered totaled approximately $200,000.
Rejecting DCA Builders' contention that A. Merowitz had breached the contract by refusing further deliveries without a guarantee of payment, the Court said:
[DCA Builders] argues that [A. Merowitz] should have continued making deliveries and its failure to do so after January 27, 1970, was a breach of contract. It is undisputed, however, that at the December 12, 1969, meeting between the parties [A. Merowitz] demanded adequate assurance that [DCA Builders] would pay its outstanding indebtedness before [A. Merowitz] would continue making deliveries. Under the circumstances, this was equivalent to a written demand for adequate assurance. It is further undisputed that [DCA Builders] failed to abide by its promise made at the conference to pay its outstanding indebtedness or even to pay for the subsequent deliveries which it thus had induced [A. Merowitz] to make. [A. Merowitz] then had `reasonable grounds for insecurity' and justifiably informed [DCA Builders] that it would deliver the balance of the material only if payment of the entire contract was guaranteed by [DCA Builders'] depositing sufficient cash in escrow to pay for the delivered materials. [DCA Builders'] failure, therefore, to provide adequate assurance of due performance within a reasonable time after the request and after the action had been brought was a repudiation of the contract and [A. Merowitz] was excused from further performance under the contract.
[Id. at 312-13, 334 A.2d 427.]
These legal principles reflected in Restatement (Second) of Contracts § 251 and illustrated by the cited cases lead us to the conclusion that Magnet Resources was entitled to condition service after December 24, 1994 on payment or an acceptable arrangement for payment of the amount which Summit owed in accordance with its contract. In our view, a properly instructed jury could not reasonably have found otherwise. Consequently, we hold that, as a matter of law, Magnet Resources' suspension of performance was not a breach and, therefore, not a material breach. Summit's repudiation of the contract by arranging to have another firm service its MRI installations was consequently the first material breach, making it liable to Magnet Resources for lost profits. Because, as a matter of law, Magnet Resources' withholding service beginning December 24 was not a material breach, Summit *985 was not prejudiced by the trial court's failure to instruct the jury that one party's material breach avoids liability by the other party for subsequent non-performance. That omission therefore entitles Summit neither to reversal of the judgment and a new trial nor to a judgment notwithstanding the verdict.
We agree with Summit, however, that the jury's verdict awarding it $18,470 is inconsistent with the verdict awarding Magnet Resources $492,320. But we disagree with Summit about the consequence of this inconsistency. The only basis Summit offered for its claim of damages was Magnet Resources' refusal to provide emergency service for the Paterson installation on and after December 24, 1994. Since Magnet Resources was legally justified in withholding service, its doing so did not constitute a breach and does not make Magnet Resources liable for losses which Summit may have sustained as a consequence. There is therefore no legal basis for the verdict in favor of Summit on its counterclaim.

-2-

Treatment of overhead in the calculation of lost profits
In the absence of a contrary agreement, an injured party with the legal right to be compensated for the breach of a contract is entitled to the amount of damages (assuming they were reasonably in the contemplation of the parties) which, excluding attorneys' fees and court costs[6] for prosecuting the breach of contract action itself, will put that party in the same position it would have been in if the breaching party had performed the contract in accordance with its terms, no better position and no worse. In re Liquidation of Integrity Ins. Co., 147 N.J. 128, 135-36, 685 A.2d 1286 (1996); Donovan v. Bachstadt, 91 N.J. 434, 444, 453 A.2d 160 (1982); 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961); 5 Corbin on Contracts § 992 (1964); 11 Williston on Contracts § 1338 (Jaeger ed., 3d ed.1968). One corollary of that rule is that if the party injured by a breach has lost profits which were reasonably anticipated to accrue from the contract, that party is entitled to recover those lost profits. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 314, 108 A.2d 616 (1954); Pickett v. Lloyds, 252 N.J.Super. 477, 491, 600 A.2d 148 (1991); Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J.Super. 200, 224, 543 A.2d 1020 (App.Div.1988), aff'd o.b., 118 N.J. 249, 571 A.2d 294 (1990). A second corollary is that the injured party should not recover expenditures which will be "saved" because it has been excused from further performance by the other party's breach. In re Community Medical Center, 623 F.2d 864, 866 (3d Cir. 1980); Argentinis v. Gould, 219 Conn. 151, 592 A.2d 378, 381 (Conn.1991); Magnolia Metal Co. v. Gale, 189 Mass. 124, 75 N.E. 219, 220 (Mass.1905); Corbin, supra, at § 1038; Restatement (Second) of Contracts § 347.
"Saved" costs obviously include those which the non-breaching party would otherwise have had to expend and which are avoided because it has been excused from performance by the other party's breach. For example, the cost of any supplies, not separately reimbursable under the terms of Magnet Resources' contract, which it would have had to purchase to service Summit's MRIs and which it did not have to purchase because of the cancellation is an example of one such "saving" that would have to be deducted from gross revenue to calculate damages measured by lost profits. See e.g., ACS Home Systems, Inc. v. Diggins, CIV.A. No. 87-5650, 1988 WL 36353, at *2 (E.D.Pa. April 19, 1988); Restatement (Second) of Contracts § 347, comment d, illustration 6. Suppose, however, that there are materials of a type needed by several of Magnet Resources' customers which it purchased for performance of its contract with Summit. If cancellation of the contract enabled Magnet Resources to use those materials for other customers, thus relieving it of the necessity of making additional purchases for the other *986 customers, the cost of those materials, although expended, has been "saved" and must be deducted to calculate lost profits. See Chicago v. Greer, 76 U.S. (9 Wall.) 726, 732, 19 L. Ed. 769, 770 (1870); Lieberman v. Templar Motor Co., 236 N.Y. 139, 140 N.E. 222, 225 (N.Y.1923); cf. Feldman v. Jacob Branfman & Son, Inc., 111 N.J.L. 37, 42, 166 A. 126 (E. & A.1933);
Administrative expenses and plant overhead have to be viewed the same way. These costs, to the extent reasonably allocable to a contract, are deductible from gross revenue to determine lost profits for breach of the contract only if they are costs which have been "saved" because the non-breaching party has been excused from future performance under the contract. Allocable administrative and overhead costs which do not diminish because of the contract cancellation should be considered "saved" only if the services, facilities and materials for which they continue to be incurred are devoted to some other employment which could not have been undertaken if the contract had not been canceled. Cf. N.J.S.A. 12A:2-708(2); U.C.C. § 2-708(2) (providing that in the event of a buyer's breach of contract one measure of damages which may be available to the seller is the amount of his lost profits, "including reasonable overhead"); S.R. Shapiro, Annotation, Comment Note: Overhead Expense as Recoverable Element of Damages, 3 A.L.R.3d 689, 695 (1965); 22 Am.Jur.2d Damages § 645 (1988).[7]
Summit's accountant, Hanafy, testified that unallocated indirect costs and overhead expenses, consisting of such items as rent, secretarial salaries, and officers' salaries, should also have been allocated to the performance of the contract. However, he based this testimony on principles of "managerial accounting," not on proof that any of those costs were "saved." Evidence was presented at trial from which the jury could reasonably have inferred that Magnet Resources (unlike a manufacturing concern, the capacity of whose machines might impose a relatively inflexible limit on its business) could probably service a smaller or larger number of MRI installations with the same administrative and plant overhead because the servicing was done primarily by technicians who worked at the customers' sites. Magnet Resources' accountant, Veth, testified that the only costs which were avoided by the cancellation of the Summit contract were direct labor, including supervisory labor, fringe benefits, material and transportation expenses. In the light of the nature of the company's business, the jury was certainly free to accept Veth's testimony as true in whole or in part.
Both parties have argued the significance of Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 486, 138 A.2d 568 (App.Div.1958), which holds that the party seeking to recover lost profits has the burden of proving that its overhead costs, particularly the compensation paid to its managing partners, are not "saved" and therefore not deductible from its gross profits to calculate damages. Summit contends that Apex Metal establishes that Magnet Resources has not sustained its burden of proof on the deductibility of overhead and administrative costs. Magnet Resources argues that the Apex Metal rule is applicable only to a manufacturing contract and not to a contract for services. We conclude that the rule is applicable without regard to whether the particular contract deals with manufacturing, sales, or services. The enterprise which has incurred the relevant costs is in *987 the best position to adduce the proof which will establish whether those costs are properly deductible from profits under the rule discussed here. However, we are also of the view that the evidence presented in this case was adequate to support Magnet Resources' burden of proof.
We also hold that, in the absence of any request to charge with respect to the burden of proving the deductibility of overhead and administrative expenses, the trial court's jury instructions on that issue do not constitute plain error requiring reversal of the judgment. The jury's attention was directed to the conflicting testimony of the parties' accountants and, in the context of that reference, it was instructed that "it is the plaintiff's burden to prove to you by a preponderance of the evidence that the overhead expenses should not be considered." After having recently heard the accountants explain why overhead and administrative expenses should or should not be deducted, the jury would have understood the instruction as asking them to determine the extent, if any, to which those expenses had been avoided because of the contract cancellation. Although a more detailed and explicit instruction would have been desirable and should have been requested by the attorneys, the charge that was given was not so inadequate as to require reversal of the judgment.

-3-

Miscellaneous Arguments
We also reject Summit's contention that the court's instruction on mitigation of damages was prejudicially erroneous. Again, neither party objected to the charge or requested a specific instruction on the issue. Furthermore, the burden of proving Magnet Resources' failure to mitigate rested on Summit. Sommer v. Kridel, 74 N.J. 446, 457, 378 A.2d 767 (1977); Ingraham v. Trowbridge Builders, 297 N.J.Super. 72, 83, 687 A.2d 785 (App.Div.1997). Summit offered no evidence to support that burden. Any error in the court's instructions on mitigation is therefore immaterial. Whether to permit Magnet Resources to reopen its case to present additional accounting testimony and whether to allow its accountant to testify to something that was not explicitly stated in his report were within the discretion of the trial court. State v. Loftin, 146 N.J. 295, 363, 680 A.2d 677 (1996); Italian Fisherman, Inc. v. Commercial Union Assurance Co., 215 N.J.Super. 278, 285-86, 521 A.2d 912 (App.Div.), certif. denied, 107 N.J. 152, 526 A.2d 211 (1987). That discretion was not abused. Summit offered no proof that any of the conditions which could have resulted in termination of the contract before its scheduled termination date was likely to occur. In the absence of such proof, Summit's argument that the jury should have been instructed to consider possible early termination is without merit.
With respect to Magnet Resources' cross-appeal, we conclude that it has not pointed to anything in the record that was presented to the summary judgment court to show that there was a genuine issue of fact which, if decided in its favor, would entitle it to a judgment against the individual defendants. There is therefore no basis for our holding that the grant of summary judgment was error. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995).
Magnet Resources' final point is that "the verdict was erroneous because, as a matter of law, plaintiff's damages should not be reduced by the amount of its overhead." The argument is entirely without merit. R. 2:11-3(e)(1)(E). We have held that Magnet Resources presented sufficient evidence to satisfy its burden of proving that its overhead costs should not be deducted from the contract revenues to determine lost profits. But there is no basis for holding that the jury was required to find that Magnet Resources proved by a preponderance of the evidence that none of its overhead and administrative expenses were avoided because of the breach.
The judgment in favor of Magnet Resources is affirmed. The judgment in favor of Summit is vacated and the case is remanded to the Law Division for the entry of a *988 judgment of no cause for action on Summit's counterclaim.
NOTES
[1] Dr. Elamir, a neurologist, is the sole owner of Summit MRI, Inc.
[2] MRIs require cryogens, which are essential coolants that need to be replenished weekly.
[3] Hanafy testified that the price was lower for the Paterson installation and that this contract was otherwise almost exactly the same as the contract for the Irvington installation.
[4] The dishonored checks were paid within a few days after they were returned.
[5] This statement of the black letter law is not intended to intimate any position on a materially breaching party's right to restitution or other similar equitable relief. See Restatement (Second) of Contracts § 374.
[6] Of course, contracts frequently provide that a party injured by a breach can recover attorney's fees and court costs as part of its damages. Such a provision is generally enforceable. See Community Realty Management, Inc. v. Harris, 155 N.J. 212, 233-34, 714 A.2d 282 (1998); Cohen v. Fair Lawn Dairies, Inc., 86 N.J.Super. 206, 213-14, 206 A.2d 585 (App.Div.1965).
[7] "Some cases take the position that indirect costssuch as rent, salary of office employees, salary of administrative personnel, utilities, and other `overhead' itemsare a part of the cost of production, and deduct them from the contract price to determine the net profit which may be recovered. [citations omitted] To the extent that the breach of contract allows the plaintiff an opportunity to enter into other contracts which now bear the same portion of the indirect costs as were to be borne by the breached contract, these cases are simply an expression of the doctrine of avoidable consequences. [citation omitted] But the proper application of the doctrine of avoidable consequences leads to the conclusion that the plaintiff is entitled to recover, as part of an award of profits, fixed indirect costs (those that could not be reduced by defendant's breach), but not variable indirect costs (those that could be avoided after the breach)."

[22 Am.Jur.2d Damages § 645, at 707 (1988) (emphasis added).]