200 N.J. Super. 59 (1985)
490 A.2d 344
JOSEPH LO RE, PLAINTIFF-RESPONDENT,
v.
TEL-AIR COMMUNICATIONS, INC., ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1984.
Decided March 26, 1985.
*63 Before Judges McELROY, DREIER and SHEBELL.
John A. Craner argued the cause for appellants (Craner & Nelson, attorneys; John A. Craner and Ellen N. Hersh, on the brief).
Thomas E. Bracken argued the cause for respondent (Thomas E. Bracken, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The parties have cross appealed from a Law Division judge, entered on a jury verdict, finding defendant liable to plaintiff[1] in the amount of $20,000 and plaintiff liable to *64 defendant for $9,550. This verdict was molded by the trial judge into a judgment for plaintiff in the amount of $10,450 plus interest.
By a contract dated October 16, 1974, defendant Tel-Air Communications, Inc. (Tel-Air) agreed to purchase from The Aeroflex Communication Systems, Inc. (Aeroflex Communications) "all of the assets of [Aeroflex Communications] used in connection with the radio common carrier operation of Station KEC-924." These assets included the General Electric base transmitter, two consoles, General Electric control and repeater facilities, and associated mobile units. Implicit in the agreement also was the transfer of the good will of the seller, since the buyer agreed to continue to render 24-hour service to all existing subscribers. The sales contract also required the assignment by Aeroflex Communications of the FCC radio license to operate the business of transmitting radio signals for mobile telephones and paging systems. The purchase price of $35,000 was payable $5,000 at the time the contract was signed (held in escrow until the closing), $10,000 payable within two years of the closing, and $20,000 to be paid "no later than three (3) years of the closing."
As part of this contract the seller agreed to provide access to the transmitter as follows:
Seller hereby agrees to provide free and reasonable access to Buyer to the existing authorized transmitter locations, towers, and facilities of Station KEC-924, twenty-four (24) hours a day, every day of the year, for the purpose of inspecting, supervising, maintaining, and repairing equipment of Station KEC-924 situated on the premises.
The transmitting tower was located on premises owned by Aeroflex Corporation, a separate corporation, also wholly owned by Aeroflex Communication's principal, Frederick Hussey. Mr. Hussey died in the spring of 1977 and was succeeded *65 by his widow, Nell P. Hussey, as President of both corporations.
For the first few years after the transfer there does not appear to have been any access problem. Neither of the Aeroflex corporations made any charge for, nor did Tel-Air offer to pay, any expenses, such as those for heating and electrical service for the maintenance of the building at the base of the tower or for the use of the tower itself.
In May 1977, Tel-Air's principal, George Stites, was called to a meeting attended by Mrs. Hussey, her attorney and the manager of the airfield located on the Aeroflex Property. During this meeting the Aeroflex attorney told Mr. Stites that he did not think that the October 1974 contract would stand up in court and that "he was going to have his associate research it and come back [to Stites] with a decision as to what they felt about the contract." Stites testified, however, that thereafter he never heard from the attorney or Mrs. Hussey concerning this point. His right of access was neither blocked nor questioned by Aeroflex.
On December 27, 1977, Tel-Air's attorney wrote to Mrs. Hussey and noted that the final $20,000 to be paid under the contract was to come due in January 1978. Since a question had been raised as to the validity of the access agreement, the attorney stated that he would hold the $20,000 in escrow until the problem was resolved. He requested "a right-of-way in recordable form granting access to the transmitter as it is presently located pursuant to the terms of paragraph 2 of the contract."
The next communication was a letter from Aeroflex Corporation's attorney, dated April 13, 1978, informing defendant's attorney that Aeroflex had contracted to sell its property and that neither Aeroflex nor the proposed buyer was prepared to make any binding commitment as to the interpretation of the Tel-Air contract. A demand was made for the $20,000 due under the contract, stating that the payment of the $20,000 was *66 not dependent upon the resolution of the ingress, egress and maintenance issue, which itself "may be subject to a judicial interpretation." Later that year, in September 1978, Stites commenced inquiries concerning the leasing of other tower facilities.
Plaintiff purchased the Aeroflex Corporation property of approximately 854 acres for $2,000,000 on November 29, 1978. The purchase agreement, in paragraph 7(A), noted that Tel-Air's attorneys were holding $20,000 in escrow and that plaintiff was to pay Aeroflex Corporation an additional $20,000, plus interest, and Aeroflex would assign to plaintiff "all of its right and interest in and to the deposit."[2]
On November 20, 1978, Tel-Air's negotiation with the owner of another tower ripened into a contract to lease that tower for ten years, commencing November 30, 1978. Tel-Air immediately commenced its renovation of the new tower at an alleged cost of $17,140. This sum included renovation costs of $9,903.50, painting charges of $2,350, replacement charges for two antennas (which could not be removed from the Aeroflex site) of $566, labor costs of $324 and charges for additional equipment of $3,996.50.
Stites met with plaintiff for the first time on December 3, 1978. At that time general discussion took place concerning the desire of plaintiff to establish a rental or maintenance charge. Although the access problem was discussed (but not resolved), plaintiff unilaterally established a procedure for defendant to gain access to the tower. A key would be kept at the airport control tower and given to defendant on request. *67 Because defendant had raised an issue of vandalism at the tower, plaintiff offered to construct a chain link fence with a gate. The key to the gate lock would likewise be available to defendant.
On February 9, 1979, Stites went to the tower to make repairs, but found that there was a locked gate controlling the access road. Since Stites was driving a four-wheel drive vehicle, he went around the gate. He found that the lock which Tel-Air had installed on the tower building during the period that Aeroflex owned the premises had been replaced, but the door had been left ajar. He later brought a locksmith to the transmitter to make keys to fit the new locks installed by plaintiff. After this incident, Tel-Air filed an emergency application with the FCC to transfer its business to the newly-rented radio tower. Plaintiff claims he honored the arrangements to leave a key to the tower building with the 24-hour personnel located at the airfield tower. Stites' son, George Stites III, however, claims that in February 1979 he attempted to gain access to the transmission tower in the early morning hours, after a power failure, but access was denied until after daylight by the people in charge of the tower. The next morning when Stites III went to pick up the key, he was told that he would have to limit his access to business hours.
In March 1979, Stites determined to transfer his radio transmission from the tower on the Aeroflex property to the tower he had rented in November 1978 and formally applied to the FCC for a transfer of the license to the new location. When his personnel began to transfer equipment from the Aeroflex tower, using the key Stites had made, plaintiff summoned the police and accused the Tel-Air personnel of trespassing. Aside from the two smaller antennas left at the Aeroflex tower (valued at $566), it does not appear that other equipment had been left on the Aeroflex premises.
The question of whether plaintiff breached the contract and thereby caused damages will be considered initially. We will *68 then consider as a separate question, also involving an analysis of plaintiff's conduct, defendant's liability to plaintiff for the final $20,000 payment.
There is no question that defendant had no obligation to continue to broadcast from the Aeroflex tower and had every right to move to the new location. However, only if plaintiff breached defendant's free and reasonable access right, would plaintiff be responsible for the alleged damages, including the cost of providing equivalent access to a new transmitter tower. The trial judge denied plaintiff's motion for judgment at the close of defendant's proof, stating:
Accordingly, the motion of the plaintiff to direct a verdict in favor of the plaintiff is denied since there is evidence from which a jury could find that the plaintiff breached the contract by failing to assure that the access provided by [the contract] was constantly afforded to the defendant counterclaimant.
The judge correctly noted that the rights possessed by defendant were not based upon an easement, but rather were in the nature of a license. He couched plaintiff's alleged breach in terms of an anticipatory breach, or a present breach by reason of plaintiff's failure to give sufficient assurances of future performance. Any damages must relate directly to transfer and start-up costs at the new location (and possibly some rental charge for a reasonable period); of necessity, they must be found to have been occasioned by plaintiff's breach of the agreement.
It is clear to us that defendant's right of entry over plaintiff's property was that of a licensee coupled with an interest in personalty. See Moore v. Schultz, 22 N.J. Super. 24, 28-29 (App.Div. 1952), aff'd o.b. 12 N.J. 329 (1953); 25 Am.Jur.2d, Easements & Licenses, § 128 at 530. Such a license is irrevocable for as long as the interest in the personalty located on the subject premises remains. Moore at 29. See also 5 Restatement, Property § 513 at 3121 (1944). Unfortunately, the court foreclosed itself from applying these principles by viewing the pleadings, rather than the proof.

*69 There is nothing pled about license coupled with an interest, and I am not going to get into it.
Although the court incorrectly charged that the license was revocable by plaintiff, the jury nevertheless apparently found that plaintiff, not defendant, had breached the underlying agreement.
The only acts that could have constituted a breach by plaintiff were (1) his predecessor's and then his questioning of the enforceability of paragraph 2 (although neither side sought a declaratory judgment by a court as to its meaning), (2) his requiring defendant to pick up the keys at the control tower, (3) his employees' denying the key to George Stites III on one occasion in the early hours of the morning of March 16, 1979, and telling him to come back after daylight when he was allegedly told of the further limitation to business hours and (4) his calling the police when it was discovered that defendant's employees obtained access without following plaintiff's access rules.
The failure of plaintiff to respond to defendant for an unreasonable length of time concerning the validity of the contract's access provisions might also be a basis for finding plaintiff in breach of the agreement. We point out, however, that all but the initial questioning of the contract by plaintiff's predecessor and plaintiff's failure to respond as to continued access prior to the signing of the new lease, occurred after defendant had secured alternative facilities by signing the 10 year lease.[3] Thus, with these two exceptions, this later conduct by plaintiff could not have caused any of defendant's damages except the two abandoned antennas, allegedly worth $566. The mere questioning of the agreement, as will be developed later, may give rise to some rights, but was not in itself a breach. Thus, only if there was an unreasonable failure of plaintiff to respond before the new lease was signed could plaintiff be *70 found to have occasioned defendant's damages in excess of $566.
Plaintiff's predecessor challenged the legal enforceability of defendant's access rights and possibly even defendant's right to utilize the tower, since Aeroflex's attorney did not specify what parts of the contract would not stand up in court. As a result, defendant was faced with a dilemma. George Stites, Jr. could pay the $20,000 due under the contract, but then be faced with having his access terminated; or he could withhold the $20,000, and possibly have his access terminated by a declaration that he was in breach of the agreement. Although there is no generally accepted method (short of an immediate declaratory judgment action) to preserve a party's rights in such a situation, the sales chapter of the uniform commercial code, although inapplicable to this non-sales case, provides a useful tool for meeting this problem. N.J.S.A. 12A:2-609 supplies a "Right to Adequate Assurance of Performance," in the following terms:
12A:2  609. Right to Adequate Assurance of Performance.
(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.
As noted in the New Jersey Study Comment to this section: "The New Jersey courts have not talked in terms of adequate assurance of performance, but some cases have indicated that our jurisprudence is consistant with such a concept." The Comment cites O'Neill v. Supreme Council American Legion *71 of Honor, 70 N.J.L. 410 (Sup.Ct. 1904). That decision, however, does not support the right of one party "to suspend any performance for which he has not already received the agreed return" until "adequate assurance of due performance" is given. N.J.S.A. 12A:2-609(1). Rather, the case defines the alternative remedies for an anticipatory breach by renunciation. O'Neill, 70 N.J.L. at 416-417.
The statutory remedy states that after 30 days a failure to give the requested assurances ripens into "a repudiation of the contract." Were we to apply similar principles to this non-sales case, no definite time period would need to be established. Since defendant withheld the $20,000 payment, while plaintiff, although questioning the agreement, made no challenge to defendant's access to the tower for many months, a stand-off position was reached.
A general contractual principle originating with U.C.C. § 2-609 has been recognized in Restatement, Contracts 2d, § 251:

§ 251. When a Failure to Give Assurance May Be Treated as a Repudiation.
(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.
Another basis for this rule, noted in the comments, is the general commercial contractual duty of "good faith and fair dealing," firmly rooted in our jurisprudence. See Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182 (1981), and cases there cited.
*72 Plaintiff and his predecessor obligated themselves to give "free and reasonable access" to defendant[4]. Defendant had been afforded open access to the tower until plaintiff unilaterally changed the locks and imposed new rules requiring defendant to obtain the key at the control tower. Open access, however, was not the contract standard. It is not usually the function of the judge to interpret the satisfaction of a contractual term of reasonableness. Michaels v. Brookchester, Inc., 26 N.J. 379, 387 (1958); Newark Publishers' Assn. v. Newark Typographical Union, 22 N.J. 419, 427 (1956). There is a fact question whether it was unreasonable to require that defendant pick up a key at the control tower. Plaintiff may well have had a right to know who was entering upon its premises and the purpose of such visit. In light of our remand, the jury will decide the meaning of the contractual term as to access in light of the conduct of the parties and plaintiff's predecessor illustrated by their past practices. The trial judge's charge will, we are sure, cover the significance of the fact that this new key procedure was established December 3, 1978, after defendant's new lease was signed for the replacement tower.
Plaintiff's employees denied defendant immediate access on March 15, 1979 when George Stites III was required to wait until daylight. This single instance of denial might support a finding that the contract was then materially breached, especially in light of George Stites III's testimony that plaintiff's new policy was to afford access only during "business hours." Alternatively, if the jury should find that plaintiff had the right to insist that defendant call at the airport tower for a key, plaintiff's actions in finally having the police eject defendant's employees might not support a finding of breach by plaintiff, in view of the fact that defendant's employees had made a duplicate key and surreptitiously entered the premises to remove defendant's equipment.
*73 The jury questions presented concerning defendant's liability for the $20,000 are sharply defined. When defendant sought assurances of plaintiff's predecessor and later of plaintiff that "free and reasonable access" would continue, did their questioning of the contract ripen into a repudiation by either: (1) the passage of time (and if so, at what time), (2) the institution of the key pick-up procedure, (3) the denial of access until daylight or business hours on the early morning of March 16, 1979, or (4) plaintiff's request for the removal of defendant's personnel by the police. Negative answers to all four of these questions would entitle plaintiff to the $20,000, as there would exist no breach of contract attributable to plaintiff. If, however, any of these questions receive an affirmative response, then defendant had a right to treat the contract as repudiated by plaintiff. Such repudiation would permit defendant to retain the $20,000 which we find had been properly withheld upon defendant's request for reasonable assurances.
If the passage of time after the request for assurances is found to constitute a breach by plaintiff or his predecessor prior to defendant's signing its new lease in November 1978, defendant would be entitled to damages. The damages would be the cost of relocation, plus the present value of the rental to be paid at the new location for a reasonable period, assuming that the locations were comparable, and, of course, the value of the antennas left at the old site. Defendant could only duplicate its former facilities and could not properly claim any expenses occasioned by enhancing the facilities over that which existed at plaintiff's tower[5].
In his charge, the trial judge did not specify the bases of liability with sufficient precision. Then, in response to a jury question, he implicated that, even if plaintiff breached the *74 agreement and defendant did not, plaintiff would be entitled to receive the disputed $20,000, with an offset for defendant's damages. The foreman, when questioned by the judge (an unusual procedure), clearly responded that the court was "correct" in that defendant did not breach the contract, but plaintiff did. The jury was polled and agreed. The jury, however, had returned a $20,000 judgment against defendant, presumably because they were so charged by the court and the judge upheld it.
Faced with these facts, we could not mold the verdict because it would entail speculation concerning the level of misunderstanding generated by the charge. In view of the potential for unfairness in such "corrective surgery," we reverse the judgment and remand the matter for a new trial on all issues and in conformity with this opinion.
NOTES
[1] We have referred to Joseph Lo Re as plaintiff herein. At oral argument we were apprised of his demise in June 1984, and an order was subsequently entered substituting Barbara Lo Re, Administratrix ad Prosequendum of the Estate of Joseph Lo Re, as plaintiff. In this opinion, however, we will continue to refer to Joseph Lo Re as plaintiff, for ease in understanding.
[2] Actually, Aeroflex assigned more than the deposit. By agreement dated December 15, 1978, Aeroflex Communication Systems, Inc. assigned to plaintiff "all of the Assignor's right, title and interest in and to an agreement between The Aeroflex Communications Systems, Inc. and Tel-Air Communications, Inc. which agreement is dated October 16, 1974." Furthermore, plaintiff noted in that agreement that he "does hereby accept" the Tel-Air contract. By this supplemental agreement, Aeroflex Communications assigned its interest in the $20,000 deposit to plaintiff.
[3] This lease provided options to renew and to purchase the underlying real estate.
[4] We assume the identity of obligations placed upon the two Aeroflex corporations through their common ownership and Aeroflex Communication's having obligated itself to provide access over Aeroflex Corporation's land.
[5] Damages could not be determined by valuing defendant's losses at the old tower because no basis exists in the record to determine what value the use of plaintiff's tower held for defendant.