**NORCON POWER PARTNERS, L.P.,**
**Plaintiff–Counter–Defendant–**
**Appellee,**

v.

**NIAGARA MOHAWK POWER CORP.,**
**Defendant–Counter–Claimant–**
**Appellant.**

**Docket No. 96–7283.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1996.

Question Certified March 25, 1997.

Certified Question Answered by
New York Court of Appeals
Dec. 1, 1998.

Decided Dec. 31, 1998.

Thomas J. Hall, Brian A. Miller, Chadbourne & Parke, LLP, New York, NY, for Plaintiff–Counter–Defendant–Appellee.

John R. Ferguson, Timothy A. Ngau, Swidler & Berlin, Washington, DC, Sharon L. Schneier, Lankenau, Kovner & Kurtz, New York, NY, for Defendant–Counter–Claimant–Appellant.

Before: FEINBERG, WALKER, and JACOBS, Circuit Judges.

JOHN M. WALKER, Jr., Circuit Judge:

Defendant–Counter–Claimant–Appellant Niagara Mohawk Power Corp. appealed from a judgment of the United States District Court for the Southern District of New York, John E. Sprizzo, *District Judge*, declaring that Niagara Mohawk has no right to demand additional security or other adequate assurances of the performance of appellee's contractual obligations under New York law, dismissing Niagara Mohawk's counterclaim, and enjoining Niagara Mohawk from terminating the contract with Norcon for failure to provide adequate assurances. *See Encogen Four Partners, L.P. v. Niagara Mohawk Power Corp.*, 914 F.Supp. 57, 63 (S.D.N.Y. 1996). We certified to the New York Court of Appeals the question of whether a party has the right to demand reasonable assurances outside the confines of contracts governed by the Uniform Commercial Code ("UCC") where the other party is solvent. *See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 110 F.3d 6 (2d Cir. 1997) (*"Norcon I"*). The New York Court of Appeals issued an opinion on December 1, 1998 that answered the question in the affirmative. *See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656 (1998) (*"Norcon II"*), attached as an Appendix to this opinion. The background of this case is set forth in the certification order, *see Norcon I*, 110 F.3d at 6–8, and we will therefore only recapture the salient facts here.

Niagara Mohawk entered into a 25–year contract for the purchase of electricity generated at Norcon's Pennsylvania facility. The contract provided for three pricing periods. The parties are currently in the second period. During the first period, Niagara Mohawk would pay Norcon six cents per kilowatt hour for electricity. During the second and third periods, the price paid by Niagara Mohawk is based on "Avoided Cost." Avoided Cost is a measure of the costs Niagara Mohawk would have incurred if it were to generate the electricity itself or purchase it from other sources. During the second period, the payments are calculated by a formula and bounded by a floor and a ceiling. An "Adjustment Account" tracks the difference between the avoided costs and the actual payments made by Niagara Mohawk. During the third period, the price paid by Niagara Mohawk is based on its avoided costs without any ceiling or floor price and payments are further adjusted to reduce the outstanding balance in the Adjustment Account. If, at the end of the second period, the Adjustment Account reflects a balance in favor of Niagara Mohawk (the case where the Avoided Costs were below the floor price) then Niagara Mohawk would correspondingly reduce its payments to Norcon. On the other hand, if the Adjustment Account reflects a balance in favor of Norcon power (the result if the Avoided Costs exceeded the ceiling price), then Niagara Mohawk would correspondingly increase its payments. Any balance remaining at the end of the third period must be paid by either party within thirty days following the end of the third period.

In February 1994, Niagara Mohawk sent Norcon a letter ("Demand Letter") expressing Niagara Mohawk's concern that because "analysis shows that the Cumulative Avoided Cost Account ... will reach over $610 million by the end of the second period" it is likely that "Norcon cannot and will not perform its payment obligations in the later years of the [contract]." To prevent a possible loss to Niagara Mohawk, the Demand Letter requested that "Norcon provide adequate assurance to Niagara Mohawk that Norcon will duly perform all of its future repayment obligations."

Norcon initiated this suit for a declaratory judgment that Niagara Mohawk has no right to demand assurances beyond the rights in the contract, and requested a permanent in-

junction to enjoin Niagara Mohawk from terminating the contract for the reasons set forth in the Demand Letter. Niagara Mohawk counterclaimed, seeking a declaratory judgment that it properly exercised its right to demand adequate assurances of Norcon's future performance.

The district court rejected Niagara Mohawk's argument that, under New York common law, a party to a contract may demand adequate assurances of future performance, and then treat the failure to provide the assurances as the repudiation of the contract. Consequently it denied Niagara Mohawk's counterclaim and enjoined Niagara Mohawk from terminating the contract with Norcon for failure to provide adequate assurances. *See Encogen Four Partners*, 914 F.Supp. at 60, 63. In our order certifying the question to the New York Court of Appeals, we noted that under present New York law, no right existed to demand adequate assurances of performance as to transactions not covered by the UCC, except where the debtor was insolvent. There was no indication that Norcon was insolvent, and the UCC does not apply to sale of electricity which is a service under New York law. *See, e.g., Bowen v. Niagara Mohawk Power Corp.*, 183 A.D.2d 293, 590 N.Y.S.2d 628, 631 (4th Dep't 1992). However, the right to demand assurances set forth in UCC § 2–609 has been adopted by the American Law Institute in the Restatement (Second) of Contracts § 251, and several states have extended the right to demand assurances to non-UCC contracts. *See, e.g., Lo Re v. Tel–Air Communications Inc.*, 200 N.J.Super. 59, 490 A.2d 344, 350 (1985) (radio station purchase); *Conference Center Ltd. v. TRC–The Research Corp. of New England*, 189 Conn. 212, 455 A.2d 857, 863–64 (1983) (constructive eviction); *Carfield & Sons, Inc. v. Cowling*, 616 P.2d 1008, 1010 (Colo.App. 1980) (construction contract); *L.E. Spitzer Co. v. Barron*, 581 P.2d 213, 216–17 (Alaska 1978) (construction contract); *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989) (real estate sale); *Jonnet Development Corp. v. Dietrich Industries, Inc.*, 316 Pa.Super. 533, 463 A.2d 1026, 1032 (1983) (real estate sale).

While we were uncertain as to whether New York would want to extend the right to demand reasonable assurances under New York law to cover the circumstances presented in this case, the possibility that the New York Court of Appeals might wish to do so led us to certify the following question to the New York Court of Appeals:

> Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is solvent and the contract is not governed by the U.C.C.?

*Norcon I*, 110 F.3d at 9.

The New York Court of Appeals answered the certified question in the affirmative, drawing an analogy to sale of oil and other tangible goods. *See Norcon II*, 1998 WL 824560 at *6. The Court emphasized the limited reach of its holding, specifying that the right to demand reasonable assurances "should apply to the type of long-term commercial contract between corporate entities entered into by Norcon and Niagara Mohawk here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract." *Id.* at *7.

Accordingly, we vacate the district court's judgment and remand for further proceedings consistent with this opinion with the costs of this appeal to be borne by Norcon.

## ATTACHMENT

## APPENDIX

Court of Appeals of New York

USCOA,2 No. 172.

Norcon Power Partners, L.P., Respondent,

v.

Niagara Mohawk Power Corp., Appellant.

John R. Ferguson (pro hac vice), for appellant.

Thomas J. Hall, for respondent.

Public Service Commission of the State of New York, amicus curiae.

## OPINION

BELLACOSA, Judge.

The doctrine, known as demand for adequate assurance of future performance, is at the heart of a Federal lawsuit that stems from a 1989 contract between Norcon Power Partner, L.P., an independent power producer, and Niagara Mohawk Power Corporation, a public utility provider. Niagara Mohawk undertook to purchase electricity generated at Norcon's Pennsylvania facility. The contract was for 25 years, but the differences emerged during the early years of the arrangement.

The case arrives on the Court's docket by certification of the substantive law question from the United States Court of Appeals for the Second Circuit. Our Court is presented with an open issue that should be settled within the framework of New York's common law development. We accepted the responsibility to address this question involving New York contract law:

> "Does a party have the right to demand adequate assurance of future performance when reasonable grounds arise to believe that the other party will commit a breach by non-performance of a contract governed by New York law, where the other party is solvent and the contract is not governed by the U.C.C.?"

As framed by the particular dispute, we answer the law question in the affirmative with an appreciation of this Court's traditional common law development method, and as proportioned to the precedential sweep of our rulings.

### I.

The Second Circuit Court of Appeals describes the three pricing methods, structure and details as follows:

> "In the first period, Niagara Mohawk pays Norcon six cents per kilowatt-hour for electricity. In the second and third periods, the price paid by Niagara Mohawk is based on 'avoided cost.' The avoided cost reflects the cost that Niagara Mohawk would incur to generate electricity itself or purchase it from other sources. In the second period, if the avoided cost falls below a certain floor price (calculated according to a formula), Niagara Mohawk is obligated to pay the floor price. By the same token, if the avoided cost rises above a certain amount (calculated according to a formula), Niagara Mohawk's payments are capped by a ceiling price. An 'adjustment account' tracks the difference between payments actually made by Niagara Mohawk in the second period and what those payments would have been if based solely on Niagara Mohawk's avoided cost.
>
> "In the third period, the price paid by Niagara Mohawk is based on its avoided cost without any ceiling or floor price. Payments made by Niagara Mohawk in the third period are adjusted to account for any balance existing in the adjustment account that operated in the second period. If the adjustment account contains a balance in favor if Niagara Mohawk — that is, the payment actually made by Niagara Mohawk in the second period exceeded what those payment would have been if based solely on Niagara Mohawk's avoided cost — then the rate paid by Niagara Mohawk will be reduced to reflect the credit. If the adjustment account contains a balance in favor of Norcon, Niagara Mohawk must make increased payment to Norcon. If a balance exists in the adjustment account a the end of the third period, the party owing the balance must pay the balance in full within thirty days of the termination of the third period" (*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 110 F.3d 6, 7 (2nd Cir.1997)).

In February 1994, Niagara Mohawk presented Norcon with a letter stating its belief, based on revised avoided cost estimates, that substantial credit in Niagara Mohawk's favor would accrue in the adjustment account during the second pricing period. "[A]nalysis shows that the Cumulative Avoided Cost Account * * * will reach over $610 million by the end of the second period." Anticipating that Norcon would not be able to satisfy the daily escalating credits in the third period, Niagara Mohawk demanded that "Norcon

provide adequate assurance to Niagara Mohawk that Norcon will duly perform all of its future repayment obligations."

Norcon promptly sued Niagara Mohawk in the United States District Court, Southern District of New York. It sought a declaration that Niagara Mohawk had no contractual right under New York State law to demand adequate assurance, beyond security provisions negotiated and expressed in the agreement. Norcon also sought a permanent injunction to stop Niagara Mohawk from anticipatorily terminating the contract based on the reasons described in the demand letter. Niagara Mohawk counterclaimed. It sought a counter declaration that it properly invoked a right to demand adequate assurance of Norcon's future payment performance of the contract.

The District Court granted Norcon's motion for summary judgment. It reasoned that New York common law recognizes the exceptional doctrine of demand for adequate assurance only when a promisor becomes insolvent, and also when the statutory sale of goods provision under UCC 2–609, in involved. Thus, the District Court ruled in Norcon's favor because neither exception applied, in fact or by analogy to the particular dispute (*decided sub nom., Encogen Four Partners, L.P. v. Niagara Mohawk Power Corp.*, 914 F.Supp. 57 (S.D.N.Y.1996).)

The Second Circuit Court of Appeals preliminarily agrees (110 F.3d 6) with the District court that, except in the case of insolvency, no common law or statutory right to demand adequate assurance exists under New York law which would affect non-UCC contracts, like the instant one. Because of the uncertainty concerning this substantive law question the Second Circuit certified the question to our Court as an aid to its correct application of New York law, and with an eye toward settlement of the important precedential impact on existing and future non-UCC commercial law matters and disputes.

## II.

Our analysis should reference a brief review of the evolution of the doctrine of demands for adequate assurance. Its roots spring from the doctrine of anticipatory repudiation (*see, Garvin, Adequate Assurance of Performance: Of Risk, Duress, and Cognition*, 69 U.Colo.L.Rev. 71, at 77 [1998]). Under that familiar precept, when a party repudiates contractual duties "prior to the time designated for performance and before" all of the consideration has been fulfilled, the "repudiation entitles the nonrepudiating party to claim damages for total breach" (*Long Is. R.R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 362 N.E.2d 558 (1977); *see*, I Farnsworth, Contracts § 8.20; Restatement [Second] of Contracts, § 253; UCC 2-610).

That switch in performance expectation and burden is readily available, applied and justified when a breaching party's words or deeds are unequivocal. Such a discernible line on the sand clears the way for the non-breaching party to broach some responsive action. When, however, the apparently breaching party's actions are equivocal or less certain, then the non-breaching party who senses an approaching storm cloud, affecting the contractual performance, is presented with a dilemma, and must weigh hard choices and serious consequences. One commentator has described the forecast options in this way:

"If the promisee regards the apparent repudiation as an anticipatory repudiation, terminates his or her own performance and sues for breach, the promisee is placed in jeopardy of being found to have breached if the court determines that the apparent repudiation was not sufficiently clear and unequivocal to constitute an anticipatory repudiation justifying nonperformance. If, on the other hand, the promisee continues to perform after perceiving an apparent repudiation, and it is subsequently determined that an anticipatory repudiation took place, the promisee may be denied recovery for post-repudiation expenditures because of his or her failure to avoid those expenses as part of a reasonable effort to mitigate damages after the repudiation" (Crespi, *The Adequate Assurance Doctrine after U.C.C. § 2-609: A Test of the Efficiency of the Common Law*, 38 Vil.L.Rev. 179, 183 [1993]; *see* Robertson, *The Right*

to Demand Adequate Assurance of Due Performance: Uniform Commercial Code Section 2–609 and Restatement [Second] of Contracts Section 251, 38 Drake L.Rev. 3305, 310 [1988–89] Dowling, A Right to Adequate Assurance of Performance in All Transactions: U.C.C. § 2–609 Beyond Sales of Goods, 48 S.Cal.L.Rev. 1358, 1358–60, 1386–87 [1975]; I Farnsworth, Contracts § 8.23a).

## III.

The Uniform Commercial Code settled on a mechanism for relieving some of this uncertainty. It allows a party to a contract for the sale of goods to demand assurance of future performance from the other party when reasonable grounds for insecurity exists (see, UCC 2–609; I Farnsworth, Contracts § 8.23). When adequate assurance is not forthcoming, repudiation is deemed confirmed, and the non-breaching party is allowed to take reasonable actions as though a repudiation had occurred (see, 4 Anderson on UCC 2–609:3 [3d ed.1983]).

UCC 2–609 provides, in relevant part:

"(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

\* \* \* \* \* \*

"(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty says such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

In theory, this UCC relief valve recognizes that "the essential purpose of a contract between commercial [parties] is actual performance \* \* \* and that a continuing sense of reliance and security that the promised per-

formance will be forthcoming when due, is an important feature of the bargain" (Official Comment 1 to UCC 2–609). In application, section 2–609 successfully implement s the laudatory objectives of quieting the doubt a party fearing repudiation may have, mitigating the dilemma flowing from that doubt, and offering the non-breaching party the opportunity to interpose timely action to deal with the unusual development (see, I Farnsworth, Contracts § 8.23a; 4 Anderson of UCC, § 2–609:36; Robertson, supra, at 353; Dowling, supra, at 1359, 1364–65; Campbell, The Right to Assurance of Performance under U.C.C. § 2–609 and Restatement [Second] of Contracts § 251; Toward a Uniform Rule of Contract Law, 50 Fordham L.Rev. 1292, at 1296–97 [1982]; but see, 1 White & Summers, Uniform Commercial Code § 6–2 [4th ed.][1995]).

Indeed, UCC 2–609 has been considered so effective in bridging the doctrinal, exceptional land operational gap related to the doctrine of anticipatory breach that some states have imported the complementary regimen of demand for adequate assurance to common law categories of contract law, using UCC 2–609 as the synapse (see e.g., Lo Re v. Tel–Air Communications, 200 N.J.Super. 59, 490 A.2d 344 (1985) [finding support in UCC 2–609 and Restatement (Second) of Contracts § 251 for applying doctrine of adequate assurance to contract to purchase radio station]; Conference Ctr. Ltd. v. TRC—The Research Corp. of New England, 189 Conn. 212, 455 A.2d 857 (1983) [analogizing to UCC 2–609, as supported by Restatement (Second) of Contracts § 251, in context of constructive eviction]).

Commentators have helped nudge this development along. They have noted that the problems redressed by UCC 2–609 are not unique to contracts for sale of goods, regulated under a purely statutory regime. Thus, they have cogently identified the need for the doctrine to be available in exceptional and qualifying common-law contractual settings and disputes because of similar practical, theoretical and salutary objective (e.g., predictability, definiteness, and stability in commercial dealings and expectations) (see e.g., Campbell, supra, at 1299–1304; see general-

ly, White, *Eight Cases and Section 251*, 67 Cornell L.Rev. 841 [1982]; Dowling, *supra*).

The American Law Institute through its Restatement (Second) of Contracts has also recognized and collected the authorities supporting this modern development. Its process and work settled upon this black letter language:

"(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

"(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case" (Restatement (Second) of Contracts § 251).

Modeled on UCC 2–609, Restatement § 251 tracks "the principle that the parties to a contract look to actual performance 'and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain'" (Restatement (Second) of Contracts § 251, comment a, quoting comment 1 to UCC 2–609, *supra*). The duty of good faith and fair dealing in the performance of the contract is also reflected in section 251 (*see*, Restatement (Second) of Contract § 251, comment a).

Some states have adopted Restatement § 251 as their common law of contracts, in varying degrees and classifications (*see, e.g., Carfield & Sons v. Cowling*, 616 P.2d 1008 (Colo.App.1980) [construction contract]; *L.E. Spitzer Co. v. Barron*, 581 P.2d 213 (Alaska 1978) [construction contract]; *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772 (Me.1989) [sale of real estate]; *but see, Mollohan v. Black Rock Contr.*, 160 W.Va. 446, 235 S.E.2d 813 (1977) [declining to adopt section 251, except to the extent that failure to give ade-

quate assurance on demand may be evidence of repudiation]).

**IV.**

New York, up to now, has refrained from expanding the right to demand adequate assurance of performance beyond the Uniform Commercial Code (*see, Sterling Power Partners v. Niagara Mohawk Power Corp.*, 239 A.D.2d 191, 657 N.Y.S.2d 407 (1997), *lv dismissed* 92 N.Y.2d 877, 677 N.Y.S.2d 783, 700 N.E.2d 322 (1998); *Schenectady Steel Co. v. Trimpoli Gen. Constr. Co.*, 43 A.D.2d 234, 350 N.Y.S.2d 920 (1974), *aff'd on other grounds* 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974)). The only other recognized exception is the insolvency setting (*see, Hanna v. Florence Iron Co. of Wisconsin*, 222 N.Y. 290, 118 N.E. 629 (1918); *Pardee v. Kanady et al.*, 100 N.Y. 121, 2 N.E. 885 (1885); *Updike v. Oakland Motor Car Co.*, 229 A.D. 632, 242 N.Y.S. 329 (1930)). Hence, the need for this certified question emerged so this Court could provide guidance towards a correct resolution of the Federal lawsuit by settling New York law with a modern pronouncement governing this kind of contract and dispute.

Niagara Mohawk, before our Court through the certified question from the Federal court, urges a comprehensive adaptation of the exceptional demand tool. This wholesale approach has also been advocated by the commentators (*see generally*, Dowling, *supra*; Campbell, *supra*). Indeed, it is even reflected in the breadth of the wording of the certified question.

This Court's jurisprudence, however, usually evolves by deciding cases and settling the law more modestly (*Rooney v. Tyson*, 91 N.Y.2d 685, 694, 674 N.Y.S.2d 616, 697 N.E.2d 571 (1998), citing Cardozo, *Nature of the Judicial Process*, in Selected Writings of Benjamin Nathan Cardozo, at 115, 134 [Margaret E. Hall. ed.1947] [observing that Judges proceed interstitially]). The twin purposes and functions of this Court's work require significant professional discipline and judicious circumspection.

We conclude, therefore, that it is necessary, while fulfilling the important and useful

certification role, to promulgate so sweeping a change and proposition in contract law, as has been sought, in one dramatic promulgation. That approach might clash with our customary incremental common law developmental process, rooted in particular fact patterns and keener wisdom acquired through observations of empirical application of a proportioned, less than absolute, rule in future cases.

It is well to note the axiom that deciding a specific case, even with the precedential comet's tail its rationale illuminates, is very different from enacting as statute of general land universal application (*see*, Breitel, *The Lawmakers*, 2 Benjamin N. Cardozo Memorial Lectures 761, 788 [1965] ["(P)rocedurally, courts are limited to viewing the problem as presented in a litigated case within the four corners of its record. A multiplication of cases will broaden the view because of the multiplication of records, but the limitation still persists because the records are confined by the rules of procedure, legal relevance, and evidence."]).

Experience and patience thus offer a more secure and realistic path to a better and fairer rule, in theory and in practical application. Therefore, this Court chooses to take the traditionally subtler approach, consistent with the proven benefits of the maturation process of the common law, including in the very area of anticipatory repudiation which spawns this relatively newer demand for assurance corollary (*see*, Garvin, *supra*, at 77–80; Robertson, *supra*, at 307–10; Dowling, *supra*, at 1359–62; *see also*, Breitel, *supra*, at 781–82 [1965] ["The commonplace, for which the Holmeses and the Cardozos had to blaze a trail in the judicial realm, assumes the rightness of the courts in making interstitial law, filling gaps in the statutory and decisional rules, and at a snail-like pace giving some forward movement to the developing law. Any law creation more than this is often said and thought to be an invalid encroachment on the legislative branch."]).

This Court is now persuaded that the policies underlying the UCC 2–609 counterpart should apply with similar cogency for the resolution of this kind of controversy. A useful analogy can be drawn between the contract at issue and a contract for the sale of goods. If the contract here was in all respects the same, except that it was for the sale of oil or some other tangible commodity instead of the sale of electricity, the parties would unquestionably be governed by the demand for adequate assurance of performance factors in UCC 2–609. We are convinced to take this prudent step because it puts commercial parties in these kinds of disputes at relatively arms length equilibrium in terms of reliability and uniformity of governing legal rubrics. The availability of the doctrine may even provide an incentive and tool for parties to resolve their own differences, perhaps without the necessity of judicial intervention. Open, serious re-negotiation of dramatic developments and changes in unusual contractual expectations and qualifying circumstances would occur because of and with any eye to the doctrine's application.

The various authorities, factors and concerns, in sum, prompt the prudence and awareness of the usefulness of recognizing the extension of the doctrine of demand for adequate assurance, as a common law analogue. It should apply to the type of long-term commercial contract between corporate entities entered into by Norcon and Niagara Mohawk here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract. Norcon's performance, in terms of reimbursing Niagara Mohawk for credits, is still years away. In the meantime, potential quantifiable damages are accumulating and Niagara Mohawk must weigh the hard choices and serious consequences that the doctrine of demand for adequate assurance is designed to mitigate. This Court needs to go no further in its promulgation of the legal standard as this suffices to declare a dispositive and proportioned answer to the certified question.

Accordingly, the certified question should be answered in the affirmative.

\* \* \* \* \* \*

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question

by this Court pursuant to section 500.17 of the Rules of Practice of the New York State o Court of Appeals, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative. Opinion by Judge Bellacosa. Chief Judge Kaye and Judges Smith, Levine, Ciparick and Wesley concur.

Decided December 1, 1998.